WILLIE PEARL DILLON, Mother and Next Friend of Jamiqua Dillon Dorris, a Minor, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Maislin Gateway Trucking *et al.*, Appellees).

First District (Industrial Commission Division)  No. 1—89—0258WC

Opinion filed March 9, 1990.

BARRY, P.J., specially concurring.

Gerald M. Sachs & Associates, Ltd., of Chicago (Charles Levy, of counsel), for appellant.

George J. Cullen & Associates, Ltd. (Charles G. Haskins, Jr., of counsel), for appellee.

JUSTICE LEWIS delivered the opinion of the court:

It is undisputed that James Dorris was employed as a truck driver by Maislin Gateway Trucking on October 3, 1981, when he sustained accidental injuries that arose out of and in the course of his employment and caused his death on that date. The dispute in this cause relates to the dependency of a minor child, Jamiqua Dillon Dorris, born on December 13, 1981.

In an amended application for adjustment of claim filed with the Illinois Industrial Commission (hereafter referred to as the Commission) in case Number 82—WC—34144, the claimant, Willie Pearl Dillon, as mother and next friend of Jamiqua Dillon Dorris, a minor, alleged that the minor was the daughter of the decedent, James Dorris. In an application for adjustment of claim filed with the Commission in case Number 81—WC—46256, the claimant, Carietha Dorris, alleged that she was the surviving dependent widow of the decedent. The cases were consolidated by the arbitrator, who, following a hearing, awarded benefits to both claimants pursuant to section 7(a) of the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.7(a)) (hereafter referred to as the Act). At the hearing before the arbitrator Willie Pearl Dillon acknowledged that Carietha Dorris was the wife of James Dorris at the time of his death and

that she herself was at the time still married to William H. Dillon.

Case law has long held that, if a woman is lawfully married at the time a child is born to her, there is a strong presumption that the lawful husband is the father of the child (*Jones v. Industrial Comm'n* (1976), 64 Ill. 2d 221, 356 N.E.2d 1; *Sugrue v. Crilley* (1928), 329 Ill. 458, 160 N.E. 857) and that a party seeking to rebut that presumption has the burden of introducing evidence which clearly and conclusively proves that the child's father is someone other than the mother's lawful husband (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1; *Sugrue*, 329 Ill. 458, 160 N.E. 857). Section 5 of the Illinois Parentage Act of 1984 (Ill. Rev. Stat. 1985, ch. 40, par. 2505), effective July 1, 1985, provides in pertinent part concerning a presumption of paternity as follows:

"(a) A man is presumed to be the natural father of a child if:

(1) he and the child's natural mother are or have been married to each other, even though the marriage is or could be declared invalid, and the child is born or conceived during such marriage ***."

Subsection (b) of this section provides that a presumption under this section may be rebutted only by clear and convincing evidence.

Upon review, sought by Carietha Dorris, the Commission found that the claimant Willie Pearl Dillon had failed to prove that Jamiqua Dillon Dorris was the minor daughter of the decedent and, therefore, denied her claim for compensation, entering an award for the claimant Carietha Dorris. Upon further review the circuit court confirmed the decision of the Commission, and this appeal by Willie Pearl Dillon followed.

The claimant presents two issues for our review: whether the trier of fact, the arbitrator, is in the best position to judge the character and veracity of a witness' testimony and whether the Commission applied the evidence used to rebut the statutory presumption of legitimacy to the issue of the decedent's paternity.

At the hearing before the arbitrator, conducted on July 26, 1985, Carietha Dorris testified that she had married James Dorris on May 23, 1970, that no children had been born of their marriage, and that while she was married to the decedent she had had no income as the result of her own employment and the decedent had been her sole support. She testified that from 1974 until the time of his death she had been living with James Dorris at 15639 Dixie Highway in Harvey, Illinois.

Willie Pearl Dillon testified that she had met James Dorris on December 31, 1980, and that he had begun living with her on Jan-

uary 1, 1981, in an apartment she was renting at "3625 Lake Park." She lived there with him and her two sons, about 8 and 10 years of age at the time. On about April 1 or May 1, 1981, the four of them moved to a single-family house located at 5129 South Emerald, apparently in Chicago, where they were living at the time of James Dorris' death. She indicated that between January 1, 1981, and October 3, 1981, on the days when he was not on the road driving he was living with her. She said that to her knowledge James Dorris did not stay anywhere else during that time. She estimated that as a result of his work he was away from the city approximately three or four days per week. The apartment and the house were leased in her name. She testified that she had paid the rent on the apartment and that the decedent had then done so "once he was there." She stated that when she lived with the decedent he paid the rent of $250 per month in "[c]ash" and received a receipt for the payment; no receipts were offered into evidence. He also paid the utilities, she said, as well as the expenses of food, clothing, and medication.

She testified that she and Dorris shared a common bedroom and had sexual relations while they lived together. When she met Dorris she was married to William H. Dillon, having married him on September 23, 1972, and lived with him until sometime in 1978, after the birth of their two sons. She stated that between 1978 and 1980, from the time she left William Dillon until she began to live with Dorris, she did not live with any other adult male. Asked whether, during the two-year time period after she had left William Dillon and before she lived with James Dorris, she had had sexual relations with any adult male, she answered, "Yes." Later, asked, "Had you had sexual relations with any other male other than James Dorris between the date that you learned that you were pregnant back to the time that you last lived with your husband?" she answered, "No." She denied having had sexual relations with anyone other than James Dorris during the time that she lived with him. She said she had learned she was pregnant on about April 8, 1981, and gave birth to Jamiqua on December 13, 1981.

She testified that about three months before Jamiqua was born she was having "contractions, stomach crampings" and was admitted to Northwestern Memorial Hospital in Chicago. She appears to have been admitted to the hospital on September 27, 1981. She said that the hospitalization was to be paid for by insurance "through his [decedent's] job." She stated that she knew who was to pay for her inpatient stay because James Dorris "had given the hospital a little paper, so if I had the baby and he wasn't at home that information

would be there." "He had given the hospital the letter," she testified, "since he was on the road." Admitted into evidence as claimant's exhibit No. 16 are copies of two documents, one of which is labeled "Group Hospital Insurance Report" and the other of which is labeled "Admission Agreement and Authorization." She identified the signature "James Dorris" in the space for "Insured Person" on the Group Hospital Insurance Report as that of the decedent. Appearing beneath the signature "James Dorris" in the space for "Insured Person" is the signature "Willie Dillon Dorris" in the space for "Patient." The letters "JD" appear beside the signature. Elsewhere on this document James Dorris' relationship to the patient, listed as "Willie Dorris," is described as "Spouse." On cross-examination she denied that the signature "Willie Dillon Dorris" was hers; asked why she had signed her name "Willie Dillon Dorris," she answered that she had not done so. On the Admission Agreement and Authorization the signature "James Dorris" appears three times. She said that none of the writing on either document was hers and indicated that she had "had nothing to do with what was put on that paper," referring to the Group Hospital Insurance Report. She added, "[I]t belonged to him [decedent], he signed it." She stated that she did not know who paid the bills incurred for the hospitalization in September of 1981, adding, "I guess it was the insurance. Mr. Dorris' insurance company." She testified that she provided the names "Jamiqua Dillon Dorris" as it appears on the minor's birth certificate. A copy of the child's birth certificate, which is in evidence, bears the signature of the mother as "Willie P. Dillon"; the space for the name of the child's father is blank.

William H. Dillon testified that he was married to Willie P. Dillon on September 23, 1972, and is still married to her but has not lived with her since sometime in 1978 and has not had sexual relations with her since their separation in 1978.

Carietha Dorris testified concerning her familiarity with James Dorris' signature and stated that she did not know whether the signature "James Dorris" on the Group Hospital Insurance Report was that of the decedent but that of "James Dorris" appearing three times on the Admission Agreement and Authorization was not that of the decedent. She testified that the signature of "James Dorris" appearing on a copy of a check, admitted into evidence, made out to her was that of the decedent.

In his decision the arbitrator concluded that at the time of his injury the decedent was 45 years of age, was earning an average weekly wage of $661.13, was married, and had a posthumous child

born on December 13, 1981, finding in relevant part as follows:

"The Arbitrator adopts the credible testimony of Willis [sic] Pearl Dillon that she conceived the minor child, Jamiqua, with the decedent, James Dorris, during the time that they resided together in Chicago. Further, the Arbitrator notes that the child, Jamiqua, was born in Chicago, Illinois, on December 13, 1981, and that Willie Pearl Dillon's testimony that she had sexual intercourse with the defendant exclusively during the accepted biological conception period was credible and truthful.

The Arbitrator also adopts the testimony of Carietha Dorris that she was the legal widow of James Dorris, deceased, on the date of death as credible and as evidenced by [certain exhibits]. The Arbitrator further finds that as the result of the aforesaid accidental injuries James Dorris departed this life on to-wit: October 3, 1981, leaving him surviving at the time of his death Carietha Dorris, his widow, and a minor child, namely: Jamiqua Dillon Dorris, born December 13, 1981[,] all of whom said decedent was under legal obligation to support and entitled to compensation on account of the death of said decedent, as provided in Section 7(a) of the Act."

Upon review the Commission, without hearing further evidence, found that the claimant Willie Pearl Dillon failed to prove that Jamiqua Dillon Dorris was the minor daughter of decedent and denied her claim for compensation on the basis of the following express findings:

"1. Decedent, a 45 year old truck driver, sustained fatal accidental injuries arising out of and in the course of his employment when his tractor-trailer [sic] overturned on October 3, 1981.

2. On December 13, 1981, a daughter, Jamiqua, was born to [claimant] Willie Pearl Dillon. [Claimants] Carietha Dorris, widow of Decedent, and Willie Pearl Dillon each testified that she was living with Decedent at the time of the accident and Willie Pearl Dillon stated that although she was married to William Dillon since 1972, still married to him at the time of the conception of Jamiqua and remained married thereafter, she had sexual relations with no one other than Decedent since she began living with him on January 1, 1981, after meeting him on December 31, 1980. Although Willie Pearl Dillon testified that Decedent had paid her rent and utilities since January 1, 1981, no receipts were introduced showing that Decedent paid these expenses.

3. William Dillon testified that he was the husband of Wil-

lie Pearl Dillon and that he had not had sexual relations with his wife since 1978.

4. The Commission notes that in *Jones v. Industrial Commission*, 64 Ill. 2d 221, 356 N.E.2d 1 (1976), the Illinois Supreme Court stated that if a child is born while a woman is lawfully married, there is a strong presumption that the lawful husband is the father of that child and a party seeking to rebut that presumption has the burden to introduce evidence that clearly and conclusively proves that the child's father is someone other than the mother's lawful husband. ILL. REV. STAT., ch. 40, §2505 now provides that this presumption of paternity can be rebutted only by clear and convincing evidence. Expert witness' testimony as to the results of blood tests is sufficient for rebuttal. The Commission finds that Petitioner Willie Pearl Dillon has failed to meet this burden because her testimony that she lived with Decedent at the same time Decedent's widow, Carietha Dorris[,] claimed to have lived with Decedent was self-deserving and lacks credibility, that her use of the name 'Dorris' for herself and Jamiqua on documents is also self-serving and that no blood test was introduced establishing that Willie Pearl Dillon's husband, William Dillon, was not the father of Jamiqua. Even if the Commission found the testimony of William Dillon that he had not had sexual relations with his wife since 1978 to be credible, this testimony has no probative value as to whether Decedent was the father of Willie Pearl Dillon's child."

Upon review, the circuit court in a 13-page memorandum decision and judgment confirmed the decision of the Commission, noting that

"[i]mplicit in the Arbitrator's determination is a finding that [claimant] Dillon overcame the strong presumption that her husband was the father of Jamiqua. The Commission reviewed the evidence and determined that [claimant] Dillon had failed to rebut the presumption, clearly and conclusively, that the child's father is someone other than [claimant] Dillon's husband, William Dillon."

The circuit court determined that the Commission "reviewed the facts and drew reasonable inferences from the facts," stating further by way of conclusion,

"The determination of the Arbitrator, especially those findings in respect to credibility, are to be given weight; however, the Commission has the responsibility of reviewing and evaluating

the evidence and making findings which are supported by the evidence. In the instant case the Court determines the findings of the Commission are not contrary to the law or against the manifest weight of the evidence."

In the circuit court the respondent employer stated that it has taken no position in the dispute with regard to either claimant Dorris or claimant Dillon, describing the dispute between these two litigants as "whether the death proceeds are payable to one or both of them." It described itself as remaining ready to pay the proceeds of the death award "once it has finally been determined which of the parties (and in what proportion) should receive said funds."

■■ ■ With regard to the first issue presented for review, claimant Dillon contends, citing no authority for the proposition, that the arbitrator is "clearly in the best position to observe the witness and determine whether the testimony is credible and truthful. His decision must stand unless it is clearly against the manifest weight of the evidence." She concludes that the arbitrator, rather than the Commission, was in the best position to judge the character and veracity of the testimony of the witnesses. It is well settled that the Commission is the judge of the credibility of the witnesses. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 454 N.E.2d 252.) It is the peculiar province of the Commission not only to determine the credibility of witnesses but also to weigh the testimony and to determine the weight to be given to the evidence. (*Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 459 N.E.2d 963; *Dunker v. Industrial Comm'n* (1984), 126 Ill. App. 3d 349, 466 N.E.2d 1255.) Regardless of whether the Commission hears testimony in addition to that heard by the arbitrator, it exercises original jurisdiction and is in no way bound by the arbitrator's findings. (*Berry*, 99 Ill. 2d 401, 459 N.E.2d 963; *Dunker*, 126 Ill. App. 3d 349, 466 N.E.2d 1255.) Claimant Dorris suggests that, in urging that the arbitrator was in the best position to observe the witnesses and to determine whether their testimony·was credible and truthful, claimant·Dillon appears to be alluding to the cases of *Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379, and *Luckenbill v. Industrial Comm'n* (1987), 155 Ill. App. 3d 106, 507 N.E.2d 1185. In *Cook*, referring to *Luckenbill*, it was indicated that the arbitrator who has heard the live testimony, as opposed to the Commission if it has not, is actually in a better position to evaluate that evidence. In *Cook* it was stated that, in cases where the Commission has rejected the arbitrator's factual findings without receiving any new evidence, an extra degree of scrutiny is applied to the record in determining

whether there is sufficient support for the Commission's decision. Even if an extra degree of scrutiny is applied to the record in making such a determination, that application does not establish a basis for the rule proposed by claimant Dillon that the decision of the arbitrator must stand unless it is clearly against the manifest weight of the evidence. The rule claimant Dillon advances is a misstatement of the standard of review expressed above and properly employed by the Commission.

With respect to the second issue raised for review, claimant Dillon maintains that the evidence presented "clearly demonstrated that decedent is the father of the minor child." She claims that the Commission improperly mixed two issues and failed to apply the requisite standards of law, the two issues being whether claimant Dillon's evidence rebutted the presumption that a child born to a married woman is that of her husband and whether the evidence shows that the decedent is the father of the minor child. She asserts that "[i]t is this mixture of the vital issues that calls for the reversal of the Commission's Decision on Review." Citing no authority, she argues, "It is the province of the Arbitrator to make findings of fact and to weigh these facts to determine if the statutory presumption has been rebutted." She relies upon *Santiago v. Silva* (1980), 90 Ill. App. 3d 554, 413 N.E.2d 139, as sustaining a paternity decree "based primarily," she says, "upon the testimony of the mother." She overlooks the fact that in *Santiago* the court relied upon the testimony of the mother together with evidence of blood tests excluding the mother's husband from paternity of the child. The other case claimant Dillon relies upon is *People ex rel. Jones v. Schmitt* (1968), 101 Ill. App. 2d 183, 242 N.E.2d 275, in which, she states, "the testimony of the wife and husband that they were not having intercourse and were occupying separate bedrooms was sufficient to rebut the statutory presumption." She fails to note that in *Schmitt* the putative father had admitted having intercourse with the relatrix on or about the date of conception, had admitted " 'there is a chance I could be the father,' " (101 Ill. App. 2d at 186, 242 N.E.2d at 276) and had stated, when told that the baby looked like him, " '[H]e ought to' " (101 Ill. App. 2d at 185, 242 N.E.2d at 276). Claimant Dillon concludes that, had the Commission properly reached the conclusion that the statutory presumption was rebutted, it should have weighed the evidence of paternity, which, she says, it failed to do.

As has already been indicated, a presumption exists that a child conceived during wedlock is legitimate; this presumption is rebuttable and can be overcome by irrefragable proof. (*Santiago*, 90

Ill. App. 3d 554, 413 N.E.2d 139; *Schmitt*, 101 Ill. App. 2d 183, 242 N.E.2d 275.) Otherwise stated, the rule is that, if a woman is lawfully married at the time a child is born to her, there is a strong presumption that the lawful husband is the father of her child. (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1.) A party seeking to rebut that presumption has the burden of introducing evidence that clearly and conclusively proves that the child's father is someone other than the mother's lawful husband. (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1.) If blood tests show that the mother's husband is not the father of the child, the presumption of legitimacy is overcome. (*Santiago*, 90 Ill. App. 3d 554, 413 N.E.2d 139.) Once the burden of producing clear and convincing evidence to rebut the presumption of the child's legitimacy has been met, the presumption of the lawful husband's paternity ceases to operate. (See *In re Paternity of Smith* (1989), 179 Ill. App. 3d 473, 534 N.E.2d 669.) An illegitimate child of a deceased employee may recover compensation under section 7 of the Act under some circumstances. (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1; *Yellow Cab Co. v. Industrial Comm'n* (1969), 42 Ill. 2d 226, 247 N.E.2d 601.) However, an award of compensation is not to be made to an illegitimate child unless paternity is proved (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1).

■ It is well established that the determination of disputed questions of fact is primarily a function of the Commission (*Jones*, 64 Ill. 2d 221, 356 N.E.2d 1) and that it is the province of the Commission to weigh the evidence and to draw reasonable inferences therefrom (*Niles Police Department v. Industrial Comm'n* (1981), 83 Ill. 2d 528, 416 N.E.2d 243). The findings of the Commission will not be set aside on review unless they are against the manifest weight of the evidence. (*U.S. Industrial Chemical Co. v. Industrial Comm'n* (1986), 143 Ill. App. 3d 881, 493 N.E.2d 646.) As stated above, the Commission is the judge of the credibility of the witnesses. *Caterpillar Tractor*, 97 Ill. 2d 35, 454 N.E.2d 252.

■ In the instant case, the Commission could reasonably infer, under the circumstances here and in the absence of blood tests excluding William Dillon from the paternity of Jamiqua, that the presumption of his paternity had not been overcome. As a consequence, the presumption of his paternity did not cease to operate, and the Commission properly concluded that claimant Dillon failed to prove that Jamiqua was the minor daughter of the decedent. Since matters of credibility are within the province of the Commission, which plainly resolved them against claimant Dillon, in view of the evidence presented we cannot say that the decision of the Commission was

contrary to its manifest weight.

The judgment of the circuit court confirming the decision of the Commission is affirmed.

Affirmed.

McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.

PRESIDING JUSTICE BARRY, specially concurring:

I concur with the majority that the Commission's decision is not contrary to the manifest weight of the evidence. The majority's opinion is confusing, however, regarding the proper standard of review to be applied when the Commission overturns the arbitrator without hearing new evidence. The simple rule is that the Commission's decision will not be overturned unless it is against the manifest weight of the evidence; but when no new evidence is introduced, reviewing courts will apply an extra degree of scrutiny in making this determination. (*Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379.) This standard applies whether the issue on review relates to an injury or to a claimant's paternity. Applied here, as the majority correctly notes, the circuit court's decision confirming the Commission's determination should be affirmed.