**Sandra BINION, on Behalf of Clifton BINION, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

No. 93 C 7636.

United States District Court, N.D. Illinois, Eastern Division.

March 20, 1996.

Gary S. Wild, Avram L. Sacks, Chicago, IL, for Plaintiff.

Ernest Yi Ling, United States Attorney's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiff seeks judicial review pursuant to 42 U.S.C. §§ 405(g), 416(h), of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner found that Clifton Binion was not entitled to Child's Insurance Benefits ("CIB") on the account of Johnny Binion because he was not the "child" of Johnny Binion (the wage earner) as that term is defined in the Social Security Act. 42 U.S.C. §§ 402(d), 416(h).

Plaintiff filed a Motion for Summary Judgment and Defendant filed a cross Motion for Summary Judgment, both of which were referred to Magistrate Judge Joan B. Gottschall pursuant to 28 U.S.C. § 636(b)(1)(B) for the entry of a Report and Recommendation ("R & R"). On November 6, 1995, the Magistrate Judge issued an R & R recommending that Plaintiff's Motion for Summary Judgment be granted and that Defendant's Motion for Summary Judgment be denied. Defendant has filed Objections to the Magistrate Judge's recommendations, and Plaintiff has filed a Response to Defendant's Objections.

In light of Defendant's Objections to the R & R, the Court reviews the Magistrate Judge's determination on a de novo basis. Fed.R.Civ.P. 72(b). For the following reasons, the Court does not accept the Magistrate Judge's recommendation and affirms the Commissioner's decision.

## I. FACTUAL BACKGROUND

Sandra and the wage earner were married in August 1965, and were divorced in January 1984. (R. 99, 111–112.) Between 1965 and 1971, four children were born to the couple. (R. 111.) The wage earner acknowledged that the four were his children in a November 19, 1975 application for disability insurance benefits, and the application states that the wage earner and Sandra had been separated for six months. (R. 100–103.)

Similarly, in a December 16, 1975 application for CIB, Sandra stated that she and the wage earner had been separated since March 1975. (R. 106, 108.)

Clifton was born on August 10, 1976, after Sandra and the wage earner filed the applications described in the preceding paragraph. The birth came before Sandra and the wage earner divorced, but the spaces for the father's name and place of birth were left blank on the birth certificate. However, the birth certificate states that the father's age was 34. (R. 104.) The wage earner, having been born on November 7, 1942 (R. 100), would have been age 34 in 1976.

Besides failing to name the wage earner as Clifton's father on the birth certificate, Sandra did not name him as a child of the marriage when the divorce court entered a judgment by default. However, Sandra's other four children by the wage earner were all named in the divorce decree. As grounds for divorce, the decree states that the wage earner "wilfully deserted the petitioner for a period of more than one year, since the 10th day of February, 1976, and still persists in such desertion to date." (R. 111–112.)

After the wage earner died in May 1991, Sandra applied for CIB on Clifton's behalf on July 2, 1991. (R. 95–98.) At that time, she made the following comment:

When my child was born my husband and I were separated and had been for about 5 months. When I provided the information for his birth certificate I did not list my husband; however I listed his age.

(R. 97.) Later, in connection with her September 27, 1991 request for reconsideration, Sandra also stated as follows:

I was married to Johnny Binion when Clifton was conceived and Johnny is Clifton's father. We were separated when Clifton was born and I didn't tell Johnny Clifton was his child until about a year ago.

(R. 122.)

During the processing of Sandra's initial application and her request for reconsideration, three witnesses, two of whom were the wage earner's siblings, signed statements attesting to their belief that the wage earner was Clifton's father. (R. 118–119, 125–126,

127–128.) Two statements attributed to the wage earner's mother provide seemingly inconsistent testimony, however. First, the record contains an unsigned and undated statement that may have been sent to the wage earner's mother for signature, but never returned (R. 40–41, 114–115.) Per that statement, the mother could not recall whether the wage earner or a daughter told her that Clifton was the wage earner's child. She also believed the wage earner told relatives that he was Clifton's father (R. 114.) Around the time of Sandra's CIB application, though, a Social Security Administration ("SSA") employee completed a second report. That document described a phone conversation in which the wage earner's mother said that the wage earner never bought things for Clifton or acknowledged that Clifton was his son. Nor did Clifton spend time with the wage earner or the wage earner's mother. Per the employee describing the phone contact, the wage earner's mother expressed an opinion that Clifton was not the wage earner's son. (R. 116–117.)

Sandra's CIB claim was denied initially, with the explanation that "a requirement of the Social Security Law is not met." (R. 120–121.) When the claim was denied on reconsideration (R. 129–132), the following explanation was provided:

The evidence on file shows that Sandra Binion married the worker on August 27, 1965, in Leflore County, Mississippi. Johnny Binion filed application for disability benefits on November 19, 1975, and indicated he had been separated from Sandra for about 6 months. This would make an approximate separation around May 1975. The birth certificate for Clifton Binion shows he was born August 10, 1976, 15 months after the worker indicated he had separated from Sandra. When she filed an application for their five other children on December 16, 1975, she indicated they had last been living with the worker prior to March 1975 at which time they were all living with her at 4304 W. Adams Street, in Chicago. When she filed the 1991 claim for Clifton, Sandra stated that 'when my child was born my husband and I were separated and had been for about 5

months.' The birth certificate for the child shows that Sandra was at the 4304 W. Adams address when the child was born August 10, 1976. The worker's address on his 1975 application was 3021 W. Jackson St., and that was the same address as given on the death certificate in May 1991. His mother (Rosa L. Washington) was listed on the death certificate as informant and was also at the same address for the deceased worker. This information implies that they had been living separate and apart since early 1975 and at the same separate residences for a substantial length of time; the worker staying in the same domicile from 1975 until his death. The Administration notes that there was no father's name given on the child's birth certificate and it was also noted that Sandra Binion gave no father's name for the child when she applied for a Social Security number for the child in February 1978. This is a strong indication that she did not consider the worker to be the father of her child born August 10, 1976. A copy of their divorce decree in January 1984 does not mention Clifton Binion as a child of the worker but it does list four other children of this marriage. As Sandra L. Binion was the petitioner and would have furnished this information to the court, it would again appear evident she did not consider this child to be the worker's.

The evidence on file supports the initial determination that Clifton Binion is not the child of the deceased wage earner, Johnny E. Binion. The presumption of the child's legitimacy has clearly been overcome by the actions of his mother and the information furnished by the worker and records with the court, Social Security Administration, and the State. The denial of benefits is affirmed as correct and in accordance with the law and Regulations.

(R. 131–132.) Statements from witnesses were not mentioned in the notice of denial.

Sandra appealed from the adverse decision, requesting a hearing before an administrative law judge ("ALJ"). Along with counsel, Sandra, Clifton and four witnesses appeared for the hearing on August 14, 1992. (R. 37.)

Responding to the ALJ's initial questions, Sandra testified that she had a sixth grade education. Although she felt that she could not read or write well, she could read a simple message and write a simple letter. (R. 44.) Sandra was not then working, and had been on public aid for about 20 years. (R. 45).

The ALJ's questions first focused on the question of when Sandra and the wage earner separated. When reminded of statements in the 1975 benefit applications to the effect that she and the wage earner were not living together after March or May 1975, Sandra testified that those statements were inaccurate. According to Sandra, between March 1975 and February 1976, the wage earner would leave home for relatively short periods, but then return. (R. 47–50, 55.) Sandra denied having had sexual relations with anyone other than the wage earner during the time she was married to him, although she acknowledged that she might have had a "friend" in the latter part of 1976. (R. 50, 55.) When asked to explain why she did not list the wage earner as the father on Clifton's birth certificate, Sandra responded that at that point in time she was having a lot of problems with the wage earner. She "really didn't want to be bothered with him anymore, because he was an alcoholic," and she "wasn't thinking." (R. 51, 60.) Clifton was born after Sandra and the wage earner separated, and the couple did not live together again after 1976. (R. 56–57.)

Similarly, Sandra testified that she did not list Clifton as a child of the marriage on the divorce decree because she "didn't want to be bothered with him anymore." Also, she did not name the wage earner as Clifton's father because the wage earner had always wanted a son. Sandra did not remember what her lawyer told her, although she acknowledged that he probably told her that she might lose benefits or support money if she did not list Clifton as one of the children in the divorce decree. (R. 53–54.) According to Sandra, the wage earner never had any money, and did not contribute to the support of Clifton or her other children. (R. 56–57, 62–63.)

There appears to be some inconsistency in Sandra's testimony as to when she told the

wage earner that Clifton was his child. Consistent with her earlier statement in connection with her request for reconsideration, she initially agreed that she told him in 1990. However, she also answered affirmatively when asked if she told the wage earner five or six years after Clifton's birth. Responding to questions aimed at clarifying the matter, Sandra stated that she probably told the wage earner before 1990. (R. 57–60.)

Sandra testified that Clifton occasionally visited the wage earner along with her other children. (R. 56, 64.) To Sandra's knowledge, the wage earner's mother, with whom he lived, treated all the children the same, including Clifton. Although they never discussed Clifton's parentage, the wage earner's mother never expressed to Sandra a belief that the wage earner was not Clifton's father. (R. 52–53.)

Following Sandra's testimony, Clifton testified that when he was six or seven years old, he knew that the wage earner was his father. In the company of his sister, Clifton periodically visited the wage earner at the house of the latter's mother. According to Clifton, the wage earner treated him like he was one of his children, giving him things on those occasions when he made gifts to the other children. (R. 65–66.)

Clifton's sister Diane Binion ("Diane") agreed that the wage earner treated Clifton like his other children, although she only heard the wage earner acknowledge on one occasion that Clifton was his child. (R. 84–86.) When asked about the wage earner's mother's attitude toward Clifton, Diane responded that her grandmother treated Clifton as a grandchild and never expressed an opinion that Clifton was not the wage earner's son. (R. 83–84.) Diane, who saw her father on almost a daily basis, expressed a belief that even though the wage earner was drunk most of the time, he understood what was going on around him. (R. 83.) The parties stipulated that Johnny Mae Binion, another of Clifton's sisters, would provide essentially the same testimony as Diane. (R. 87.)

Sammy Binion ("Sammy"), a brother of the *wage earner,* testified that the wage earner told him that he was the father of all San-

dra's children. Sammy estimated that the wage earner first told him Clifton was his child between 1978 and 1981. (R. 70–71.) Sammy further testified that his mother treated Clifton like the other children, although he did not know whether she considered Clifton the wage earner's son. (R. 71–72.)

Alberta Ball ("Alberta") a sister of the wage earner, expressed uncertainty as to whether the wage earner was living with their mother or with Sandra at the time Clifton would have been conceived. (R. 75–76.) However, she recalled that shortly after Clifton's birth, the wage earner told her that Clifton was his son. The conversation took place outside Alberta's and the wage earner's mother's home, but the mother was inside the house. (R. 78.) According to Alberta, the wage earner and their mother treated Clifton the same as Sandra's other children. (R. 74, 78–79.) The wage earner also would have stated in their mother's presence that all Sandra's children were his. (R. 78.) Although the wage earner was a chronic alcoholic, Alberta felt that the wage earner knew what he was saying when he told her that Clifton was his son. (R. 79–81.) Alberta could not recall whether their mother expressed an opinion on the question whether Clifton was the wage earner's child. (R. 77.)

After the close of testimony by the witnesses, counsel advised the ALJ that all his witnesses were willing to submit to blood testing, provided the SSA would pay for the tests. (R. 87–88.) The ALJ indicated that he might order the tests, as well as records of blood type from the hospital when the wage earner died. (R. 90–91.) Later, though, the ALJ advised Plaintiff's counsel of a conversation with hematologist Jacob Bertran, M.D. ("Bertran"). Based on his discussion with Bertran, the ALJ concluded that the proposed tests would not satisfy the requirements of Illinois law. Accordingly, there were no blood tests. (R. 29–30, 139.)

In a decision of September 8, 1992, the ALJ determined that Clifton was not a "child" of the wage earner within the meaning of the Social Security Act. (R. 21.) Following a review of the documentary evidence

and the testimony at Sandra's hearing (R. 21–25), the ALJ noted that in CIB cases where paternity is at issue, the adjudicator looks to state law to determine if the child could inherit from the insured. Under Illinois law, a child born to a married woman is presumed to be legitimate, and that presumption can only be overcome by clear and convincing evidence. (R. 25.) Applying those principles, the ALJ provided the following explanation for his decision.

> In the case before me, the issue is whether there is "clear and convincing" evidence to rebut the presumption that Clifton is the wage earner's son. I find that there is clear and convincing evidence to rebut this presumption. The most compelling evidence in this case is the failure of Sandra Binion to name the wage earner as the father on Clifton's birth certificate or to name Clifton as a child of the marriage in the divorce decree. These are admissions, made by the claimant's own mother, against her interest and she, of course, is in the best position to know if the wage earner was truly the father. At the hearing, Sandra Binion tried to explain her reasons for her actions. Regarding the birth certificate, she said that she had been having problems with the wage earner around the time of Clifton's birth due to the wage earner's alcoholism and she "wasn't thinking." Regarding the divorce decree, she admitted that she had been represented by counsel at that time and had probably been told that benefits would flow from naming a child as a child of the marriage. She said that she wanted to deny the wage earner his only son because she was so angry with him and did not want to be bothered with him any more. I find these explanations to be not credible and they are self-serving and unbelievable. This is particularly true in light of the fact that the wage earner reported, in his application for disability benefits, that he had been separated from Sandra Binion for approximately six months prior to November, 1975, or May, 1975 (Exhibit 3). This would have been several months before Clifton was conceived. In the divorce decree, however, the date of desertion is February 10, 1976 (Exhibit 8). Sandra Binion tried to explain the discrepancy by stating that in 1975, the wage earner occasionally left her and lived with his mother for periods of time, but then would return to her and her family. Again, this explanation is self-serving and unbelievable.

> Significantly, the wage earner's mother, Rosa Lee Binion, stated during a telephone conversation with a claims examiner that her son had never told her that Clifton was his son. She believed that Clifton was not the wage earner's son (Exhibit 10). As counsel noted, this statement is a summary of the conversation between the claims examiner and the mother of the wage earner. She never saw the summary, nor did she sign it. These proceedings, however, are not formal and are not bound by the rules of evidence. I accept the statement of the mother of the wage earner, found in Exhibit 10.

> I have also considered the evidence of the various witnesses at the hearing and statements made by them in the record. I have accorded them little weight because of the overwhelming evidence provided by Sandra Binion's actions in failing to name the wage earner as the father on the birth certificate or Clifton Binion as a child of the marriage in the divorce decree. Significantly, the divorce decree also fails to mention Charley Binion, a child born to Sandra Binion, out of wedlock, prior to her marriage to the wage earner. The strong implication is that just as Charley Binion was not named as a child of the marriage in the divorce decree, neither was Clifton named, because he, too, was not a child of the marriage (Exhibit 8).

(R. 25–26.) In addition, the ALJ noted that he had not ordered blood tests, based on the advice of hematologist Bertran. Although the ALJ did not discuss the content of his conversation with Bertran, his decision suggests that comparison of a child's blood type with the blood type listed in medical records of a decedent is insufficient proof of paternity under Illinois law. In summary, the ALJ found that Clifton was not entitled to CIB on the wage earner's record because there was clear and convincing evidence to rebut presumption of legitimacy under Illinois law, and

because he could not establish his right to benefits under any other test set forth in the Act or implementing regulations. 42 U.S.C. § 416(h); 20 C.F.R. § 404.355. (R. 27.)

In the course of seeking Appeals Council review of the ALJ's adverse decision, counsel presented written arguments and protested delay in ruling on the request for review. (R. 4–11, 14.) In its October 22, 1993 decision denying review, the Appeals Council stated that neither it nor the ALJ had authority to order blood testing. However, it indicated that if Sandra arranged for tests, the results of those tests might provide new and material evidence under provisions for the reopening and revision of decisions. (R. 2–3.)

On December 21, 1993, Sandra filed this action for judicial review of the Commissioner's decision.

## II. ANALYSIS

■ Since the Appeals Council has refused to reconsider the ALJ's decision, the ALJ's findings and conclusions constitute the final decision of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir.1994). Section 405(g) of the Social Security Act grants federal courts the authority to review a final decision with the power to affirm, modify or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). However, the scope of review is quite limited. This Court must consider all of the evidence in the record, it may not decide facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).

■ In determining whether substantial evidence supports the decision, the Court must review all evidence in the record to ascertain whether it contains "such relevant evidence as a reasonable mind might accept as adequate to support ˙the conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). An ALJ's findings must be supported by more than a scintilla of evidence; however, they may be supported by less than the weight of the evidence. *Delgado*, 782 F.2d at 83. Additionally, the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427.

The Social Security Act allows an individual to demonstrate that he is the "child" of an inured wage earner, and therefore entitled to benefits on the wage earner's account, in several ways. *Trammell ex rel. Trammell v. Bowen*, 819 F.2d 167, 168 (7th Cir.1987). To determine whether a claimant is a "child" of an insured individual, the Commissioner applies the law that would be applied in determining the devolution of intestate personal property by the courts of the state in which the wage earner was domiciled when the application was filed or, if applicable, when the wage earner died. 42 U.S.C. § 416(h)(2)(A). The most common way for an individual to show that he is the child of the wage earner is if the mother is (or was) married to the insured wage earner. 42 U.S.C. § 402(d)(3)(A); *Trammell*, 819 F.2d at 168. However, the Act provides other methods for establishing eligibility for CIB where the claimant is neither legitimate nor adopted. 42 U.S.C. § 416(h); *Trammell*, 819 F.2d at 168. Simply stated, "[i]f the child's biological mother is married to the child's father (the deceased wage earner), then the child is eligible, without more, for benefits.... But if the child is illegitimate, he must squeeze himself into one of the limited set of niches, and if he can't then he gets no benefits...." *Bennemon ex rel. Williams v. Sullivan*, 914 F.2d 987, 989 (7th Cir.1990).

In the instant case, Clifton was born during the marriage of his mother to the wage earner, and Sandra Binion claims that the wage earner is Clifton's father. Therefore, Plaintiff does not resort to any of the alternative methods of proving status as a "child" under the Act. Because the wage earner, Johnny Binion, was a domiciliary of Illinois at the time of his death, Illinois law determines Clifton Binion's eligibility for CIB.

Under Illinois law, a man is presumed to be the natural father of a child if "he and the child's natural mother are or have been married to each other, ... and the child is born or conceived during such marriage...." 750

ILCS 45/5. A presumption under this section may be rebutted only by clear and convincing evidence. 750 ILCS 45/5; *In re Estate of Willis,* 214 Ill.App.3d 683, 690, 158 Ill.Dec. 378, 383, 574 N.E.2d 172, 177 (1st Dist.1991); *Dillon v. Industrial Comm'n,* 195 Ill.App.3d 599, 601, 142 Ill.Dec. 341, 342, 552 N.E.2d 1082, 1083 (1st Dist.1990).

In a case where the putative recipient of benefits was illegitimate, the Seventh Circuit noted that Illinois courts have defined proof by clear and convincing evidence of paternity as "the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Parker v. Sullivan,* 891 F.2d 185, 188 (7th Cir.1989) (citing *Estate of Ragen,* 79 Ill.App.3d 8, 13–14, 34 Ill.Dec. 523, 528, 398 N.E.2d 198, 203 (1st Dist.1979)). However, a recent Illinois decision reversed and remanded the case due in part to the trial court's erroneous explanation of the "clear and convincing" evidence standard as requiring proof "beyond a reasonable doubt." *People ex rel. Mendez v. Villa,* 260 Ill.App.3d 866, 198 Ill. Dec. 263, 632 N.E.2d 322 (1994). Additionally, in a case decided a year before *Parker,* the Seventh Circuit commented that at least one Illinois court analogized "clear and convincing evidence" to the "reasonable doubt" standard in a paternity case, however, the Seventh Circuit left open whether a less exacting burden of proof could suffice. *Brown v. Bowen,* 847 F.2d 342, 345–46 (7th Cir. 1988). While noting that the clear and convincing standard is somewhere in between the standards for preponderance of the evidence and beyond a reasonable doubt, the court explained that:

> The levels of confidence required by the burdens of proof are themselves variable.... The more serious the consequences (and therefore the higher costs of error), the more asymmetric the stakes ..., the higher the level of certainty required.... Illinois treats the determination of paternity for intestate succession as a serious matter, in which the risk of error is potentially high....

*Id.* at 346. Finally, in *Willis,* the court held that what constitutes "clear and convincing" evidence "depends on the particular circumstances of each case." *Willis,* 214 Ill.App.3d at 690, 158 Ill.Dec. at 383, 574 N.E.2d at 177. This Court finds that there is substantial evidence to support the ALJ's findings of fact even under the more rigorous definitions of the "clear and convincing" evidence standard.

The parties agree that the presumption of legitimacy applies in this case, as Clifton was born during the marriage of his mother and the wage earner. Therefore, this Court must determine whether substantial evidence supports the ALJ's decision that clear and convincing evidence rebutted the presumption that Johnny Binion was Clifton Binion's father—that is, whether the ALJ could reasonably find that clear and convincing evidence in the record rebutted the presumption of Clifton's legitimacy.

In the R & R, Magistrate Judge Gottschall determined that the ALJ's finding that the presumption of Clifton Binion's legitimacy was overcome by clear and convincing evidence was not supported by substantial evidence. Defendant objects to the Magistrate Judge's recommendation and argues that it was reasonable for the ALJ to find by clear and convincing evidence that the presumption of Clifton's paternity was rebutted because all of the documentary evidence in the record, generated years before any controversy over Clifton's parentage arose, supports the ALJ's decision. Defendant asserts that the Magistrate Judge failed to apply the "substantial evidence" standard, and instead, substituted her own opinion for that of the ALJ.

Specifically, the Magistrate Judge concluded that the Commissioner did not meet her "burden of proof" of establishing by clear and convincing evidence that her husband was not the father, and therefore, the Magistrate Judge recommended summary judgment in favor of Plaintiff. (R & R, p. 21.) However, the question is not whether "substantial evidence" supports Plaintiff's position, but whether substantial evidence supports the ALJ's decision. In addition, Defendant notes that the Magistrate found that Sandra's hearing testimony "could" have been consistent with her 1975 signed statement that she and Johnny were separated when Clifton was conceived, and that

Sandra's explanation of the omission of Johnny's name from Clifton's birth certificate was "plausible." (R & R, p. 18–19.) But the issue is not whether the Magistrate Judge would have found Sandra's testimony credible, but whether the ALJ's finding that her testimony was not credible was patently wrong. *See Imani ex rel. Hayes v. Heckler*, 797 F.2d 508, 512 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). In sum, Defendant argues that the Magistrate Judge did not apply the "substantial evidence" standard of review to the ALJ's factfinding and instead reweighed the evidence presented to the ALJ.

■ This Court finds that it was reasonable for the ALJ to find that clear and convincing evidence rebutted the presumption of Clifton's paternity. The ALJ based his decision on documentary evidence in the record that was written before there was a dispute, involving monetary benefits, over whether the wage earner was Clifton's father. *See Sugrue v. Crilley*, 329 Ill. 458, 160 N.E. 847, 850, *cert. denied*, 278 U.S. 616, 49 S.Ct. 20, 73 L.Ed. 539 (1928) ("Declarations made after a controversy concerning the parentage of a child arises lacks the guaranty of trustworthiness which is present when the declarant is free from inducement to misrepresent the facts."). In reaching this decision, the ALJ relied on the following evidence: (1) the absence of the Johnny's name on Clifton's birth certificate; (2) the absence of Clifton's name (along with the name of Sandra's first child, fathered by another man) from the divorce decree; (3) statements in Sandra's and Johnny's 1975 applications for benefits asserting that they had been separated since at least May 1975, five months before Clifton was conceived; and (4) Rosa Lee Binion, the wage earner's mother, allegedly told an employee by telephone that she did not believe Clifton was Johnny's son.[1] Finally, the ALJ's assessment of the credibility of Sandra and the other witnesses at the hearing further supported his determination that Clifton's paternity was rebutted by clear and convincing evidence.

The evidence in the record contrary to the ALJ's decision consists of: (1) the testimony of Sandra Binion; (2) the testimony of Clifton and his siblings; and (3) the testimony of Sandra's in-laws. Sandra testified at the hearing that she and Johnny had not been separated before February 1976, including during the period when Clifton was conceived, but said that during that period, Johnny would leave her for brief periods of time and then return and live with her for a week or so at a time. (R. 47–48.) Sandra then testified that she and Johnny had lived together constantly between May 1975 and February 1976, and did not separate at all until February 1976. (R. 49.)

■ Therefore, Sandra's testimony denying that she and Johnny were separated before February 1976 conflicts directly with the signed statements both she and Johnny made in 1975. (R. 100–03, 105–08.) Specifically, when Johnny Binion filed for Disability Insurance Benefits ("DIB") in November 1975, he reported that he and Sandra had been separated for about six months, and that the children lived with their mother at 4304 West Adams Street in Chicago. (R. 102–03.) When Sandra applied for Child's Insurance Benefits on behalf of her five children in December 1975 (Clifton was not born yet), she reported her address as 4304 West Adams Street, and indicated that all of the children for whom she sought CIB were living with her, stating "My husband had been living with all children prior to 3/75." (R. 105–08.) Thus, both Sandra and Johnny reported that they were separated during the period in which Clifton was conceived. The ALJ is entitled to accord greater weight to the contemporaneous evidence than to Sandra's inconsistent and retrospective testimony. *See Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991) (ALJ could accord greater weight to contemporaneous evidence than to retrospective reports).

The remaining evidence supporting Sandra's claim consists of the testimony of her children and in-laws that Clifton was Johnny Binion's son. However, the in-law's testimony conflicts directly with Sandra's explana-

---

1. In addition, Sandra omitted Johnny's name from an application for a social security number for Clifton, but the ALJ did not mention the omission in his opinion.

tion for the omissions of Johnny name from Clifton's birth certificate and the divorce decree. Sandra explained that she made these omissions because she did not want to be bothered with Johnny and did not want him to know that Clifton was his son. (R. 51, 54.) In a September 1991 report to the state agency, she submitted a signed statement indicating that she did not tell Johnny that Clifton was his son until 1990. (R. 122–23.) That signed statement, however, conflicts with the testimony of her husband's brother, who said that Johnny told him Clifton was his son sometime between 1978 and 1981, or at least nine years before Sandra allegedly "told" her husband that he was Clifton's father. (R. 71.) Further, her statement also conflicts with the testimony and signed statement of Johnny Binion's sister that Johnny told her that Clifton was his son right after he was born—some fourteen years before Sandra said she "told" Johnny he was Clifton's father. (R. 78, 122–23.)

■ Because the statements of Johnny's brother and sister directly undermine Sandra's explanation of the documentary omissions in the record, the ALJ reasonably found that Sandra's testimony on this crucial point was not credible. *Willis*, 214 Ill.App.3d 683, 158 Ill.Dec. 378, 574 N.E.2d 172 (The factfinder is in the best position to weigh the evidence and consider the credibility of witnesses.); *Imani ex. rel. Hayes v. Heckler*, 797 F.2d 508, 512 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986) (The ALJ's credibility findings should be affirmed unless patently wrong.). The ALJ was reasonable in finding that the omissions of Johnny's name from Clifton's birth certificate and of Clifton's name from the divorce decree, in addition to the inconsistent statements about when Sandra and Johnny separated, and Sandra's and Johnny's contemporaneous signed statements that they were separated at the time Clifton was conceived, constitute substantial evidence to support the ALJ's conclusion that the presumption that Johnny was Clifton's father was rebutted by clear and convincing evidence. This Court can not reweigh the evidence and substitute its judgment for that of the ALJ. *See Delgado*, 782 F.2d at 82. A review of the record in the instant case reveals that a reasonable mind would find the relevant evidence adequate to support the ALJ's conclusion. *See Richardson*, 402 U.S. at 400–01, 91 S.Ct. at 1427.

In addition, Plaintiff claims that the ALJ's failure to order blood tests to confirm that Johnny Binion was not Clifton's father breached his duty to fully develop the record. In addition, Plaintiff claims that the ALJ's "reliance" on ex parte post hearing communication between the ALJ and hematologist denied due process to Plaintiff. This issue was not addressed by the Magistrate Judge in the R & R.

The ALJ attempted to arrange blood tests after the hearing. (R. 139.) The ALJ contacted a hematologist who explained that there would be no point in obtaining blood tests if the alleged father could not be tested. (R. 139.) The ALJ noted that he informed Plaintiff's counsel regarding the substance of his telephone conversation with the hematologist, Dr. Bertran, and Plaintiff's counsel indicated that he might call the hematologist himself. (R. 129.) At the end of his opinion, the ALJ explained his conversation with the hematologist, but he did not discuss the lack of blood tests as evidence in the case. (R. 27.) The ALJ did not draw an adverse inference from the absence of the blood tests because the hematologist's statements regarding the efficacy of performing blood tests in this case was not "evidence," but an explanation for the impossibility of obtaining evidence without a living father. In the October 22, 1993 decision by the Appeals Council denying review, the Appeals Council explained that neither the ALJ nor the Appeals Council had the authority to "order" that blood tests be performed. (R. 2.)

The Illinois statute states that a court "shall order or direct the mother, child, and alleged father to submit to appropriate tests." 750 ILCS 45/11 (West 1993 & Supp. 1995); (R. 137.) The current version of the law also provides for DNA testing but retains the requirement that the alleged father be tested. 750 ILCS 45/11(a) (West Supp. 1995). Although the Illinois statute provides that the alleged father be tested, the statute makes no provision on what testing shall or

can be ordered when the alleged father is deceased. 750 ILCS 45/11 (West 1993 & Supp.1995). *See Schultz v. Peeler,* 10 Ill. App.3d 937, 295 N.E.2d 252 (1973) (finding that the death of the child prevented the taking of blood tests under the Illinois Act on Blood Tests to Determine Paternity of 1971 and that the suit should be treated as if the results of such tests were inconclusive and inadmissible).

Plaintiff has failed to submit any evidence or authority as to the accuracy of blood tests based on the alleged father's medical records, or based on the blood tests of the mother, the child, and the other sibling of the presumed father without tests of the presumed father himself. Plaintiff was represented by counsel throughout these proceedings. Plaintiff could have submitted any evidence obtained after the hearing to the ALJ prior to his decision, to the Appeals Council in conjunction with her request for review of the ALJ's decision, to the ALJ or Appeals Council pursuant to 20 C.F.R. §§ 404.988 and 404.989 prior to September 13, 1995 as provided by the Appeals Council's decision denying review, and to this Court with a request for remand pursuant to 42 U.S.C. § 405(g). Despite these opportunities, Plaintiff has not submitted the blood tests as evidence, nor has Plaintiff offered evidence that the Court should order blood tests pursuant to 750 ILCS 45/11 (West 1993 & Supp.1995) even though the father is no longer living.

■ In sum, although Plaintiff challenges the suggestion that blood tests without the father being available for testing are insufficient to prove paternity, Plaintiff does not offer, nor has this Court found, any authority or evidence to the contrary. Accordingly, the Court finds that the ALJ adequately developed the record.

Plaintiff asserts, citing *Lonzollo v. Weinberger,* 534 F.2d 712 (7th Cir.1976) and *Oyen v. Shalala,* 865 F.Supp. 497 (N.D.Ill.1994), that the ALJ's failure to obtain the blood tests discussed at the hearing denied her due process. The cases cited by Plaintiff are distinguishable from the instant case where the ALJ did not rely on the lack of blood test results in reaching his decision.

In *Lonzollo,* the Appeals Council relied on the report of a physician who examined the claimant after the ALJ had issued a decision to award benefits. *Lonzollo,* 534 F.2d at 714. Plaintiff claimed that he was denied his right to a hearing when the Appeals Council reversed the ALJ's decision, basing its findings on the physician's report, because the report was not presented at the hearing and the plaintiff was not given an opportunity to present evidence to rebut the report. *Id.* The case was remanded for further administrative hearing because the Appeals Council based its fact-finding on evidence not introduced at the hearing. *Id.*

■ In *Oyen,* the court found that the ALJ's failure to permit cross examination of the physician who presented post-hearing evidence regarding the plaintiff's functional capacity violated the plaintiff's right to due process. *Oyen,* 865 F.Supp. at 509. The ALJ in *Oyen* had accorded "great weight" to the post-hearing evidence, and the court stated that "if the ALJ's decision had not looked at [the physician's conclusions] at all …, the due process and other violations as to that piece of evidence might have been of no moment." *Id.* In the instant case the ALJ drew no adverse inference from the absence of blood test evidence. Because the ALJ did not rely on the absence of the blood test evidence to support his finding that Clifton was not Johnny Binion's child, and because no authority required the ALJ to obtain blood tests, the ALJ's decision not to order blood tests did not violate Plaintiff's constitutional right to due process.

## III. CONCLUSION

For the reasons stated above, the Court does not accept the Magistrate Judge's Report and Recommendation. Accordingly, the Court affirms the Social Security Administration's denial of Plaintiff's application for Child's Insurance Benefits on behalf of her son, Clifton Binion. Defendant's Motion for Summary Judgment is granted and Plaintiff's Motion for summary Judgment is denied.