151 F.3d 1034
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Joseph H. THOMAS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 98-1185.
 United States Court of Appeals, Seventh Circuit.
 Submitted August 5, 1998[1].
Decided Aug. 17, 1998.
 
 Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. No. 1:97-CV-90, Roger B. Cosbey, Magistrate Judge.
 Before Hon. WILLIAM J. BAUER, Hon. HARLINGTON WOOD, Jr., Hon. FRANK H. EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 Joseph H. Thomas appeals from the district court's order upholding the denial of his applications for disability insurance benefits (DIB) and supplemental security income (SSI) by the Social Security Administration (SSA). This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). On appeal, Thomas contends that (1) the Administrative Law Judge's finding that his condition did not meet the criteria for listed impairment 12.05(C) (mental retardation and additional, significant, work-related mental or physical impairments) was not supported by substantial evidence; and (2) the Social Security Administration failed to meet its burden of showing that Thomas could perform a limited range of medium work.
 
 Background
 
 2
 Thomas was 47 years old at the time of alleged onset of disability, and 57 when an Administrative Law Judge (ALJ) issued the decision under review in this appeal. He left school early (sometime between 4th and 7th grade) to work on the family farm. Later, he worked for over 25 years as a construction worker, performing strenuous labor. In December 1986, he quit work because he repeatedly experienced dizziness, and chest and back pain. Over the next ten years, he saw numerous doctors on a fairly regular basis. He has been diagnosed with the following physical ailments: hypertension, angina, diabetes mellitus, carpal tunnel syndrome, mild lumbar spondylosis, and mild degenerative facet sclerosis and hypertrophy at the lumbosacral junction. Over the years, Thomas has consistently complained to doctors about chest pain, vision disturbance, generalized body pain, hand problems, headaches, dizziness, chronic fatigue and weakness, and tuberculosis. At times, Thomas has also received conflicting diagnoses in relation to possible mental problems, including an I.Q. in the mildly retarded range, somatoform disorder, major depression, illiteracy, and alcohol abuse.
 
 
 3
 Since 1987, this case has been before several different ALJs six times, before the Appeals Council six times, and before the district court twice. From 1987 to 1990, the focus in the SSA proceedings was on physical ailments (hypertension, arthritis), although in 1989, an ALJ did mention that there was no basis for a psychiatric evaluation. In 1991, questions of possible psychiatric problems were repeatedly mentioned in the records of Thomas's treating physicians. In 1992, the cardiac problems worsened somewhat, and a psychological evaluation was performed for the first time, revealing an I.Q. of 61. (Subsequent I.Q. tests were most consistently in the 60s[2].) The psychological evaluation also mentioned the possibility of hypochondria and somatoform disorder.
 
 
 4
 By 1992 and 1993, there were several additional psychological evaluations, some supporting a finding of possible (or "rule out") somatoform disorder, major depression, and anxiety; others found Thomas to be a malingerer with a "fake bad" profile revealed by several personality tests. His family doctors treated him successfully with anti-depressant medications. Most reports agreed that Thomas functioned as an individual with a "low-average" intelligence, that is, higher than his I.Q. scores might otherwise suggest. In 1993, an ALJ found the many I.Q. tests to be invalid because Thomas was not credible and possibly exaggerating or malingering. But the Secretary, in 1994, filed a motion in the district court conceding the validity of the I.Q. tests, and asking the district court to remand to the SSA, which the court did. In 1995, there were more psychological tests, again with conflicting results.
 
 
 5
 In 1996, an ALJ again denied benefits, rejecting the validity of many of the psychological test results and relying on the many professionals who found Thomas to be exaggerating or malingering. Because the Appeals Council denied Thomas's request for review, this 1996 ALJ decision is the SSA's final decision, and the one this court now reviews on appeal. Eads v. Secretary of Dept. of Health & Human Services, 983 F.2d 815, 816-17 (7th Cir.1993). The parties consented to have the case heard by a magistrate judge, who affirmed the decision of the SSA to deny Thomas's application for DIB and SSI awards.
 
 
 6
 This court reviews the district court's decision de novo. 42 U.S.C. § 405(g). The final decision of the SSA shall be affirmed if it is supported by substantial evidence. Adventist Living Centers, Inc., v. Bowen, 881 F.2d 1417, 1420 (7th Cir.1989). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997). Further, the court cannot reweigh the evidence presented to the ALJ. Id. Where conflicting evidence would permit reasonable minds to differ as to whether a claimant is disabled, the SSA must make that determination. Walker v. Bowen, 834 F.2d 635, 643-44 (7th Cir.1987).
 
 Analysis
 
 7
 The SSA has established a list of impairments that, if the statutory criteria are met, make an individual automatically eligible for benefits. See 20 C.F.R. § 416.920(d); 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00-13.00. See also Sullivan v. Zebley, 493 U.S. 521, 532-33, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In order to establish a disability of mental retardation under section 12.05(C), a claimant must establish both: "a valid verbal, performance, or full scale IQ score of 60 through 70" and a "physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Part 404, subpt. P, app. 1 § 12.05(C) (1992).
 
 
 8
 The ALJ found that Thomas had "no severe mental impairment,"[3] and his "alleged limited intellectual and literacy skills are not as he portrayed them." The ALJ added that Thomas's "alleged mental limitations are found to be clearly exaggerated and untruthful, and inconsistent with his conduct and behavior." He had a "limited education or less," but he was "not illiterate."
 
 
 9
 Thomas clearly is not illiterate.[4] The ALJ properly relied on the contrast between psychological evaluations indicating that Thomas could barely recite his alphabet, and a lengthy handwritten letter Thomas sent to the SSA. (The district court also received a handwritten letter from Thomas, with relatively correct grammar, complete sentences, and proper spelling and punctuation.) See Gwathney v. Chater, 104 F.3d 1043, 1044-45 (8th Cir.1997); Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir.1995). The ALJ could also properly find substantial evidence in the record to support his finding that Thomas's I.Q. was higher than 70. In discounting the validity of the I.Q. scores, the ALJ noted that three of the four psychologists who examined Thomas suggested he might be a malingerer, or at least exaggerating his symptoms.
 
 
 10
 The ALJ rejected the opinion of Kenneth Bundza, a psychologist, who found Thomas possibly revealed suggestions of a somatoform disorder and was not malingering. The ALJ found that Bundza "attempted to cast the best light on [the test] results by stating that the claimant probably did not comprehend the questions nor gave particularly articulate responses." The ALJ found this inconsistent with Bundza's earlier finding that claimant did not manifest any extremely serious communication problems. The ALJ rejected nearly identical conclusions of another psychologist, Dr. Von Bergen, on similar grounds.[5]
 
 
 11
 The ALJ was faced with contradictory evidence. Consequently, he was entitled to rely on psychological evaluations that were strongly supported by the examination results and conflicted with findings made by Bundza and Von Bargen. See Books v. Chater, 91 F.3d 972, 979 (7th Cir.1996); Dray v. Railroad Retirement Board, 10 F.3d 1306, 1310 (7th Cir.1993). For example, the ALJ found the psychological evaluation of Michael J. Didier to be "more thorough" than those conducted by others. Didier noted that the personality inventory testing revealed a "fake bad" profile, and suggested that Thomas was falsifying opinions about himself. Didier concluded that Thomas was either intentionally malingering or randomly responding to test items.
 
 
 12
 The ALJ was also entitled to rely on the psychological evaluation conducted by Thomas W. Vodde, a psychologist. Vodde found that Thomas had a verbal IQ of 73, performance IQ of 68, and full scale IQ score of 71. The ALJ concluded that Thomas had "no significant mental limitations, with an estimated low-average IQ, [and] sufficient literacy skills." The ALJ was entitled to heavily rely on Vodde's findings that a neuropsychological battery administered to Thomas portrayed an individual who could barely ambulate, speak, comprehend, and attend; would require monitoring and supervision for routine, daily tasks; would be virtually unable to carry on conversations or perform any purposeful activity; and would be illiterate. Vodde concluded that the results were grossly out of proportion with Thomas's manner of presentation and current functioning level. Vodde also found that Thomas's responses were selective, and he exaggerated and magnified both psychological and physical symptoms. He found that Thomas was either malingering or grossly exaggerating his responses. The ALJ was entitled to rely on these findings. Psychologists also pointed to inconsistencies such as "discrepant responses on testing," and the ability to "answer more difficult items while missing easier ones." Several psychologists (along with a number of physicians) who examined or treated Thomas over the years remarked repeatedly on the possibility that he was a malingerer, and his stated goal of achieving a disability benefit award.
 
 
 13
 Thomas next contends that substantial evidence does not support the ALJ's finding at step five of the sequential analysis that Thomas was able to perform a limited range of medium work,[6] including limitations for a sit/stand option, limited walking during the day, and lifting and carrying 25 pounds maximum. The ALJ discussed at length Thomas's unfounded subjective complaints, the lack of serious objective findings in the medical records, and Thomas's daily activities. He was entitled to conclude that Thomas's own account of his physical capacity was fairly consistent with a limited range of medium work. See Luna v. Shalala, 22 F.3d 687, 692 (7th Cir.1994).
 
 
 14
 The ALJ specifically found that the uncontrolled diabetes was "sufficiently severe to significantly affect his work-related abilities." However, the ALJ found the diabetes was not severe enough to equal a listed impairment, and not severe enough to affect Thomas's ability to work, except to impose several limitations on his ability to perform medium work, such as avoiding heavy, strenuous work activity, "given the associated generalized weakness and pain problems this condition may generate." The ALJ also found that Thomas suffered from hypertension and angina, and clearly suffered from intermittent chest pains, but the problems were controlled with medication therapy and no doctor imposed significant limitations on Thomas. This conclusion is supported by the medical records. Thomas suffered from arthritis, and from mild degenerative facet sclerosis and hypertrophy at the lumbosacral junction, along with mild lumbar spondylosis, but generally the tests showed "only mild abnormalities at most." Moreover, the treating physician (Dr. Scheeringa) noted that the arthritis did not account for Thomas's subjective complaints, and that Thomas seemed "intent on avoiding work." Thomas also suffered from carpal tunnel syndrome, but it was resolved with "conservative treatment." The ALJ also found the following were not impairments (severe or otherwise): vision problems, headaches, dizziness, illiteracy, depression, low-average I.Q., and history of alcohol abuse, currently in remission. The medical records show that some of these alleged ailments were never documented, and others were controlled by medication or other treatment and did not interfere with work-related activity. The ALJ could properly conclude that there was no showing from any of the extensive medical records that even the combination of these ailments imposed significant work limitations such that Thomas could not perform a limited range of medium work.
 
 
 15
 Thomas next argues that the ALJ omitted several key facts in the hypothetical question he presented to the vocational expert (VE) who testified at the hearing. Thomas argues that the hypothetical was defective because it omitted facts such as his diabetes, age, limited past work history, limited education, low I.Q., and various physical ailments (heart and chest pain, vision disturbances, arthritis, general body pain, headaches, dizziness, chronic fatigue and weakness, and medical side effects). Most of these alleged ailments could properly be excluded, since the ALJ had already concluded they either did not exist or were minor impairments. See Herron v. Shalala, 19 F.3d 329, 337 (7th Cir.1994). As to the omission of Thomas's diabetes, which the ALJ had found to be a severe impairment, no error occurred because the ALJ included in the hypothetical the work limitations based on symptoms that could be related to diabetes. The questions were worded in terms of functional limitations imposed by Thomas's various conditions, instead of simply listing the conditions. The hypothetical also did not include intellectual or mental limitations, but the ALJ had already rejected the opinions of the two psychologists who believed Thomas was functionally illiterate and should be limited to routine, repetitive tasks due to his lack of intellectual ability or formal education. Thus, the ALJ's omission of these characteristics from his hypothetical question is supported by the record. Moreover, the VE heard the testimony given at the hearing. See Ehrhart, 969 F.2d at 540; Ragsdale v. Shalala, 53 F.3d 816, 820 (7th Cir.1995). The VE appeared to have a clear picture of Thomas's situation from Thomas's own testimony, and the other information supplied by the parties. Thus, we conclude that the factual assumptions underlying the hypothetical question posed to the VE were sufficiently supported by the evidence. See Cass v. Shalala, 8 F.3d 552, 556 (7th Cir.1993); Diaz v. Secretary of Health & Human Services, 898 F.2d 774 (10th Cir.1990); Benskin v.. Bowen, 830 F.2d 878 (8th Cir.1987). Moreover, Thomas's attorney expressly declined the ALJ's invitation to question the VE. See Ragsdale, 53 F.3d at 820.
 
 Conclusion
 
 16
 We conclude that the findings of the ALJ are supported by substantial evidence on the record as a whole, and therefore the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The court has granted the appellant's motion to waive oral argument. Consequently, the appeal is submitted on the briefs and record. See Fed.R.App.P. 34(a); Cir.R. 34(f)
 
 
 [2]
 In three sets of tests (WAIS-R), the verbal, performance and full I.Q. scores were, respectively: 66, 62, 61; 66, 67, 64; 73, 68, 71. A Stanford Binet test resulted in a score of 44
 
 
 [3]
 See 20 C.F.R. § 404.1520a(b) (under the regulations relating to mental disabilities, the ALJ must evaluate pertinent signs, symptoms, and findings to determine if a mental impairment exists; analyze whether certain medical findings relevant to a claimant's ability to work are present or absent; rate the degree of functional loss resulting from the impairment in four areas deemed essential to work; if the mental impairment is severe, the ALJ must determine whether it meets or equals a listed mental disorder; and if the mental impairment is severe but does not meet or equal a listing, the ALJ must conduct a RFC assessment)
 
 
 [4]
 The regulations define illiteracy: "Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564(b)(1)
 
 
 [5]
 The fact that the ALJ partially rejected Bundza's findings on the basis that Thomas's attorney hired Bundza does not detract from the other, proper grounds upon which he rejected Bundza's conclusions, including the numerous reports from psychologists and physicians stating that they believed Thomas was intentionally malingering and had no impairment that would prevent him from working. See Piepgras v. Chater, 76 F.3d 233, 237 (8th Cir.1996); Lester v. Chater, 81 F.3d 821, 832 (9th Cir.1995)
 
 
 [6]
 "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c)