**Sandra BINION, o/b/o Clifton BINION, Plaintiff–Appellant,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant–Appellee.**

No. 96–2228.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1997.

Decided March 11, 1997.

Gary S. Wild, Avram L. Sacks (argued), Chicago, IL, for plaintiff–appellant.

Mary Thorson (argued), Department of Health and Human Services, Region V, Office of the General Counsel, Ernest Y. Ling, Office of United States Attorney, Civil Division, Chicago, IL, for defendant–appellee.

Before MANION, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Is Clifton Binion the biological son of Johnny E. Binion? We can't be absolutely sure. But, we *can* say Clifton is the legal son of Johnny E. Binion for purposes of survivor's benefits, and because we can, the judgment of the district court affirming a decision of the Commissioner of Social Security is reversed.

Sandra Binion and Johnny E. Binion were married in 1965 and had four children, all girls, between 1966 and 1971. Sandra also had an older son, Charley, from a previous relationship. Clifton Binion, the child for whom Sandra presently attempts to obtain child's insurance benefits, was born to Sandra on August 10, 1976. At the time of Clifton's birth, Sandra and Johnny were separated. On Clifton's birth certificate, Sandra left blank the spaces for the father's name and place of birth, but she indicated the father's age was 34. Johnny turned 34 a few months after Clifton's birth.

Sandra and Johnny divorced in January 1984. The divorce decree, entered by default because Johnny did not respond to Sandra's complaint, stated that Johnny deserted Sandra for a period of a year or more, beginning on February 10, 1976. The divorce decree listed the four daughters as children of the marriage, but did not list Clifton or Charley. All information on the decree came from Sandra.

Johnny Binion died in May 1991. In July of that year Sandra filed, on Clifton's behalf, a claim under the Social Security Act, 42 U.S.C. §§ 402(d), seeking child's insurance benefits based on the earnings record of Johnny, a deceased wage earner. Because Johnny's name did not appear on the birth certificate, suspicions were raised at the Social Security Administration—the folks there thought Clifton might not be Johnny's legitimate child. After some investigation, Sandra's claim was denied, and Sandra requested a hearing before an administrative law judge. The hearing took place in August 1992. On September 8, 1992, the ALJ denied Sandra's claim, ruling that Clifton was not Johnny's child within the meaning of the Social Security Act. Sandra's request for review by the Administration's appeals council was denied in October 1993, and the ALJ's decision became the final decision of the Commissioner of Social Security.[1]

On December 21, 1993, pursuant to 42 U.S.C. § 405(g), Sandra filed a complaint in district court seeking review of the Commissioner's denial of Clifton's child's insurance benefits. In November 1995 the magistrate judge (now District Judge Joan Gottschall) assigned to the case recommended that the denial of benefits be reversed and that Sandra's motion for summary judgment be granted. The district court disagreed with the recommendation and, on March 20, 1996, granted the Commissioner's motion for summary judgment, which affirmed the denial of benefits. From that decision, Sandra appeals.

The ALJ's findings of fact must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence" is evidence which a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Imani, on behalf of Hayes v. Heckler*, 797 F.2d 508, 510 (7th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). A federal court may not decide facts anew, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner. *Walker v. Bowen*, 834 F.2d 635, 640, 643–44 (7th Cir.1987). Conclusions of law are not entitled to deference, however, so if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Imani*, 797 F.2d at 510.

To obtain child's survivorship benefits for Clifton due to Johnny's death, Sandra must establish that Clifton was the "child" of Johnny as defined in the Social Security Act. Although the Act allows an individual to establish that he is the child in several ways, *see* 42 U.S.C. § 416(h), Sandra has pursued only one: that Clifton was Johnny's legitimate child and a product of their marriage. 42 U.S.C. §§ 402(d)(3)(A), 416(e), 416(h)(2)(A). The parties agree that to determine whether Clifton is a legitimate child for benefits eligibility, the Administration applies the substantive law regarding devolution of intestate personal property of the state in which Johnny was domiciled at the time of his death. 42 U.S.C. § 416(h)(2)(A).

Johnny died while living in Chicago so the law of the Illini state controls this case. Under the Illinois Parentage Act, which affects

---

1. The administrative determination denying benefits actually was made by the Secretary of Health and Human Services, Donna E. Shalala, against whom Sandra brought this lawsuit. Effective March 31, 1995, however, the duties of the Secretary regarding Social Security cases were transferred to the Commissioner of Social Security, Shirley S. Chater, pursuant to the Social Security Independence and Program Improvements Act of 1994, P.L. No. 103–296, 108 Stat. 1464. The district court substituted Commissioner Chater for Secretary Shalala, and for ease of reference, we will refer to the Commissioner rather than the Secretary.

intestate succession, a man is presumed to be the natural father of a child if he and the child's natural mother are or have been married to each other and the child is born or conceived during the marriage. 750 ILCS 45/5(a)(1). This presumption of legitimacy may be rebutted only by clear and convincing evidence. 750 ILCS 45/5(b). The parties agree that Sandra and Johnny were married when Clifton was conceived and born and that Clifton therefore is presumed to be Johnny's child under Illinois law. The issue for us is whether the presumption has, as a matter of law, been rebutted by clear and convincing evidence.

What constitutes clear and convincing proof depends on the circumstances of a given case. *In re Estate of Willis,* 214 Ill. App.3d 683, 690, 158 Ill.Dec. 378, 574 N.E.2d 172, *appeal denied,* 141 Ill.2d 539, 162 Ill. Dec. 486, 580 N.E.2d 112 (1991). In Illinois paternity cases,

> clear and convincing evidence is considered to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. The spectrum of increasing degrees of proof, from preponderance of the evidence, to clear and convincing evidence, to beyond a reasonable doubt, is widely recognized, and it has been suggested that the standard of proof required would be clearer if the degrees of proof were defined, respectively, as probably true, highly probably true, and almost certainly true.

*Chang v. Ragen (In re Estate of Ragen),* 79 Ill.App.3d 8, 14, 34 Ill.Dec. 523, 398 N.E.2d 198 (1979) (citations omitted). In some legitimacy presumption cases "clear and convincing" evidence has also been described as "clear and irrefragable" proof. *See People ex rel. Gonzalez v. Monroe,* 43 Ill.App.2d 1, 6, 192 N.E.2d 691 (1963) ("There is a presumption that the husband is the father of a child born to his wife.... [T]he presumption and clarity of the law are in the child's favor and those who wish to bastardize him must make out the fact by clear and irrefragable proof."). "Irrefragable proof" means "proof of such character that it cannot be disputed." *People ex rel. Repsel v. Kirk,* 133 Ill.App.2d 771, 775, 273 N.E.2d 86 (1971).

In a more recent Social Security case involving Illinois' legitimacy law, we described the various legal standards as:

> The preponderance standard is a more-likely-than-not rule, under which the trier of fact rules for the plaintiff if it thinks the chance greater than 0.5 that the plaintiff is in the right. The reasonable doubt standard is much higher, perhaps 0.9 or better. The clear-and-convincing standard is somewhere in between.

*Brown v. Bowen,* 847 F.2d 342, 345–46 (7th Cir.1988). Within each range of a burden of proof, the levels of evidence vary: " 'Beyond a reasonable doubt' means one thing in a misdemeanor case and another in a capital case.... The more serious the consequences ... the higher the level of certainty required." *Id.* at 346. Illinois treats the determination of paternity as a very serious matter. *Id.; Gonzalez,* 43 Ill.App.2d at 6, 7, 192 N.E.2d 691 (the presumption that a husband is the father of a child born to his wife "has great force and vigor" and is "one of the strongest presumptions in law"). In 1963, an Illinois court indicated that the presumption that a husband is the father of a child born to his wife "was conceived for the purpose of preserving family stability and protecting helpless infants from the stigma of illegitimacy." *Gonzalez,* 43 Ill.App.2d at 6, 192 N.E.2d 691. Today, the stigma attached to a child born outside of marriage has softened. For proof, one need look no further than the topic "Children Out–of–Wedlock" in West's key number system, an entry that not long ago read "Bastards." A change, however, in how society generally treats children born outside of marriage does not lessen the importance of the state interest. The devolution of intestate property and child support are still affected by such rules. And Illinois gives us no indication that it treats paternity and its rules of legitimacy any less seriously today than it did years ago.

What all this tells us is that the level of proof for legitimacy cases should be at the high end of the clear and convincing range. In sum, between the word "irrefragable" and the importance of the state interest, proof against legitimacy has to be extremely strong to overcome the presumption.

■ In addition to the omissions on the birth certificate and divorce decree, the evidence before the ALJ included two applications for benefits. In a November 1975 application for disability insurance benefits, made around the likely time of Clifton's conception, Johnny said the four girls were his children and he and Sandra had been separated for 6 months. Johnny noted his address as his mother's home in Chicago. In her December 1975 application for child's insurance benefits, Sandra stated that all four children were living with her (in Chicago) and that Johnny had not lived with them since March 1975. Sandra did not, however, use the word "separated" to describe her relationship with Johnny.

At the 1992 administrative hearing, Sandra testified that Johnny's note in his application that they were separated was not really accurate, because although between 1974 and February 1976 Johnny periodically left her for a week or so at a time to live with his mother, he would come back to live with Sandra. Contradicting her own 1975 application for benefits but in sync with the divorce decree, Sandra indicated that she and Johnny did not completely separate until February 1976, and that at the time of Clifton's conception they were living together. Sandra explained that she did not list Johnny on Clifton's birth certificate because she was having problems with him at the time and "didn't want to be bothered with him anymore, because he was an alcoholic." According to Sandra, she remained sexually faithful to her husband until late 1976. In regard to the divorce decree, Sandra testified that out of spite she chose not to list Clifton as a child of the marriage, because Johnny always wanted a son and she wanted to deny him official recognition that he had one. She said her attorney for the divorce probably told her benefits for Clifton could be affected if she did not list him, but she did not care; Johnny paid nothing to support his children anyway.

Also at the administrative hearing, Johnny's sister and brother, Alberta Ball and Sammy Binion, testified that Johnny told them Clifton was his son and that Johnny's mother, Rosa Lee, treated all of the children the same, implying that she thought they were all her grandchildren. Johnny and Sandra's daughter Diane said Johnny acknowledged Clifton as his son and that Clifton and the four sisters were all treated the same by Johnny and Rosa Lee. The ALJ stipulated that another of Clifton's sisters would have said the same thing, so she was not called to testify. Clifton testified that he periodically visited Johnny with his sisters and that Johnny treated him the same; for instance, Clifton received candy, gifts, and other such items just like his sisters did.

Finally, the ALJ considered two statements attributed to Rosa Lee, Johnny's mother. One was an unsigned testimonial prepared for Rosa Lee's signature, apparently by an Administration employee who spoke with Rosa Lee. Although Rosa Lee never signed the document to verify its contents, the text states that "during the period in question" Rosa Lee believed Johnny and Sandra lived together and that Johnny told other relatives Clifton was his son. The second reported statement came from a memo of an employee of the Administration following a telephone conversation with Rosa Lee. The memo said Rosa Lee believed Clifton was not Johnny's son, that Johnny never spent time with Clifton or bought Clifton clothes or necessities, and that Johnny would say the same if he were alive. Rosa Lee herself did not testify at the hearing and never actually signed either statement. Alberta Ball, who was Rosa Lee's daughter, did, however, indicate to the ALJ that Rosa Lee generally told the truth.

Based on this evidence,[2] the ALJ found clear and convincing evidence rebutting the presumption of Clifton's legitimacy. He found compelling the absence of Johnny's name on the birth certificate and the absence of Clifton's name, like Charley's, on the divorce decree. He found Sandra's explanations regarding these omissions and her actu-

---

**2.** The ALJ stated at the hearing that he would try to arrange DNA blood tests for Sandra, Clifton, Johnny's siblings, and Sandra and Johnny's four daughters, but later changed his mind after talking with a hematologist, who said a live father was necessary for the tests to be valid. Sandra and the others, however, were willing to take the tests.

al separation date from Johnny unbelievable, especially in light of the 1975 benefits applications, made at a time when she had nothing to gain (unlike the situation at the administrative hearing). The ALJ also accepted as true the second (unsigned) statement attributed to Johnny's mother, indicating she did not believe Clifton was Johnny's son and that Johnny would say the same. The ALJ did not address Rosa Lee's other statement and accorded the testimony of Johnny's siblings, Clifton's sisters, and Clifton himself "little weight because of the overwhelming evidence provided by Sandra Binion's actions in failing to name the wage earner as the father on the birth certificate or Clifton Binion as a child of the marriage in the divorce decree."

■ The ALJ's determination that Clifton is not Johnny's child seems like a factual finding, but it's actually a mixed question of fact and law for it rests on the application of Illinois paternity law to the facts. The parties have not addressed the standard of review for such a mixed question and have assumed that the "substantial evidence" test applies to this case. We will do the same, as we believe Sandra wins this case even under this stricter test.

Under Illinois law, certain irrefutable evidence standing on its own clearly and convincingly rebuts the presumption of legitimacy. For instance, if blood tests indicate the mother's husband is not the father of the child, the presumption of legitimacy is overcome. 750 ILCS 45/11(g); *Dillon v. Industrial Comm'n*, 195 Ill.App.3d 599, 609, 142 Ill.Dec. 341, 552 N.E.2d 1082 (1990). If a husband had no access to his wife during the time of conception, the presumption is rebutted. *Willis*, 214 Ill.App.3d at 690, 158 Ill. Dec. 378, 574 N.E.2d 172; *Gonzalez*, 43 Ill. App.2d at 6, 192 N.E.2d 691. And if evidence conclusively shows that a husband has no "power of procreation," the presumption is rebutted. *Gonzalez*, 43 Ill.App.2d at 7, 192 N.E.2d 691. No irrefutable evidence, howev-

er, exists in this case.[3] In the absence of conclusive evidence, we must weigh all evidence presented to the ALJ and analyze the present situation in light of Illinois law.

In *Dillon*, 195 Ill.App.3d 599, 142 Ill.Dec. 341, 552 N.E.2d 1082, the presumption of legitimacy was not overcome. Willie Dillon wanted to claim death benefits under workers' compensation laws for her daughter, whom she asserted was the decedent James Dorris's child. Willie was married to a chap named Dillon when the child was conceived and born. Dorris's wife also wanted to claim death benefits and disputed the child's paternity by her husband. Willie and Dorris's wife each testified that she was living with Dorris at the time of the child's conception and Dorris's death. Willie testified and Dillon confirmed that they had not had intercourse for 3 years prior to the child's birth. The child's birth certificate did not list a father's name. Willie presented hospitalization documents on which the signature of a James Dorris appeared several times and Dorris was described as Willie's spouse, and claimed that her hospitalization was paid by Dorris's insurance. Dorris's wife, though, testified that the signatures on the hospital forms did not look like those of her husband. The Illinois Appellate Court determined that in the face of conflicting testimony regarding where Dorris lived, the inconclusive signatures on the hospital forms, and the lack of any other extremely persuasive evidence, the presumption was not sufficiently rebutted: "[T]he [Industrial] Commission could reasonably infer, under the circumstances here and in the absence of blood tests excluding William Dillon from the paternity ... the presumption of his paternity had not been overcome." *Id.* at 609, 142 Ill.Dec. 341, 552 N.E.2d 1082.

Similarly, the presumption of the husband's fathering of the child was not rebutted in *Repsel*, 133 Ill.App.2d 771, 273 N.E.2d 86, where Lois Repsel attempted to establish

3. Sandra contends that one of these elements is *required* to rebut the legitimacy presumption and that the ALJ committed a legal error in deciding to the contrary. We disagree. The Illinois cases say these methods are *not* the only means of defeating the legitimacy presumption. For instance, although the court in *Willis* did mention

inaccessibility as a basis for its decision, that fact was only one of several upon which the court relied. Likewise, in *Dillon*, although the lack of blood test evidence was noted, the court in no way indicated that only such evidence would rebut the presumption.

that Kenneth Kirk was the father of her child. At the time of the child's conception, Repsel was married to someone else. Repsel testified and her husband stipulated that they had not had intercourse for over a year prior to the child's birth. Throughout the possible time of conception, however, the husband lived in the same city as Repsel and worked in close proximity to Repsel's apartment, and Repsel occasionally took the couple's older child to her husband's residence. Repsel testified that she had intercourse with Kirk several times, but Kirk denied such a relationship. Another witness indicated that the baby resembled Kirk and that Kirk once said "it wasn't all his fault" in regard to the pregnancy. No father's name appeared on the birth certificate. While recognizing that Kirk's testimony was somewhat unbelievable, the Illinois Appellate Court nevertheless found that the evidence fell short of the quantum of proof necessary to rebut the presumption that the baby was fathered by Repsel's husband.

*Willis*, 214 Ill.App.3d 683, 158 Ill.Dec. 378, 574 N.E.2d 172, reflects a situation where clear and convincing evidence overcame the presumption of a husband's fatherhood. Lanna Harris was involved in probate proceedings regarding the estate of Charles Willis, whom she claimed was her father. At the time Lanna was born her mother was married to Otis Harris, so the presumption that she was Otis's daughter had to be overcome before she could be declared an heir to Willis's estate. The Illinois Appellate Court found the legitimacy presumption rebutted based on the following: Lanna's mother testified that Willis was Lanna's father and that she had no contact with Otis at the time of conception because Otis was in prison, Lanna's birth certificate omitted a father's name, the divorce decree between Lanna's mother and Otis did not list her as a child requiring support even though she was a minor at the time, Otis had not objected to the omission of Lanna's name on the divorce decree, relatives and friends testified to Lanna's and Willis's father/daughter relationship, photographs showed Lanna with Willis, Lanna paid part of Willis's burial costs, and two of Willis's life insurance policies identified Lanna as his daughter or the mother of his

grandchild. *Willis*, 214 Ill.App.3d at 690–91, 158 Ill.Dec. 378, 574 N.E.2d 172.

The Illinois Appellate Court also held the presumption adequately rebutted and a putative father's paternity proved in *People ex rel. Jones v. Schmitt*, 101 Ill.App.2d 183, 184–86, 242 N.E.2d 275 (1968), where the child's mother and her husband both testified they had not had intercourse during the period of conception and for several months prior even though they lived in the same house at the time, the putative father bought wedding rings around the time of the mother's divorce, paid some of the mother's hospital bills from the birth, told an unrelated witness who mentioned that the baby looked like him that it "ought to," admitted having sex with the mother around the time of conception, and said there was a chance he could be the father.

And finally, in *People ex rel. Smith v. Cobb*, 33 Ill.App.3d 68, 337 N.E.2d 313 (1975), the court found the legitimacy presumption rebutted when both husband and wife testified that they had not lived together for over 2 years prior to the child's birth, the child's mother and the putative father both testified they lived together at the time of conception and birth of the child, the mother and putative father had joint checking accounts, the putative father was listed as father on the birth certificate, and his insurance carried the mother and the child.

With these cases in mind we return to Sandra's claim that the presumption of Clifton's legitimacy has not been overcome. Although we have already noted the evidence relied on by the ALJ, we summarize it here: (a) the lack of Johnny's name and place of birth on the birth certificate; (b) the lack of Clifton's name, like Charley's, on the divorce decree; (c) the 1975 benefits applications by Johnny and Sandra indicating they were separated prior to the date of conception; (d) the unsigned statement by Rosa Lee to the Administration employee that she did not believe Clifton was Johnny's son; and (e) the unbelievability of Sandra's explanations because they were self-serving.

Sandra contends that the ALJ committed a legal error by considering the

missing name on the birth certificate and the omission on the divorce decree. In essence she argues that under Illinois case law these omissions must be completely ignored. Sandra is wrong about the birth certificate. A birth certificate with no father's name is indeed admissible in a paternity case and is probative of the fact that a child may have been born out of wedlock. *People ex rel. Kelly v. Pasko,* 184 Ill.App.3d 528, 537–38, 132 Ill.Dec. 722, 540 N.E.2d 462 (1989); *People ex rel. Ashford v. Ziemann,* 110 Ill. App.3d 34, 38, 65 Ill.Dec. 741, 441 N.E.2d 1255 (1982), *aff'd,* 99 Ill.2d 353, 76 Ill.Dec. 805, 459 N.E.2d 940 (1984). In regard to the divorce decree, Sandra is somewhat correct: the omission, *standing alone,* is not sufficient to rebut the presumption that Clifton is Johnny's child. Under Illinois law, a finding or implication of a child's paternity resulting from an earlier divorce proceeding is not binding on the child in any other action unless the child was a party to the prior proceeding. *Simcox v. Simcox,* 131 Ill.2d 491, 497, 137 Ill.Dec. 664, 546 N.E.2d 609 (1989). But just because it may not alone be sufficient to rebut the presumption of legitimacy does not mean it must be ignored as evidence. The *Willis* court, in fact, used omissions on both a birth certificate and divorce decree as evidence that supported overriding the presumption of legitimacy. In short, the ALJ did not commit an error of law by considering the absent names on the birth certificate and divorce decree as evidence supporting his finding.

The ALJ, however, found that the omissions on the birth certificate and divorce decree had very close to a dispositive effect. *Dillon, Repsel,* and *Willis* show that contrary to what the ALJ thought, omissions on a birth certificate and divorce decree, while implying that the husband may not be the father, are not dispositive. *Dillon* and *Repsel* indicate that the omission on the birth certificate, even together with other evidence pointing away from the husband and toward another man, may not be enough to overcome the presumption, while *Willis* merely includes similar omissions on a divorce decree and birth certificate among several reasons for finding the presumption overcome. Because both omissions exist in this case,

their suggestion that Johnny may not be Clifton's biological father adds up, but are they enough, combined with Rosa Lee's statement and the 1975 benefits applications, to constitute clear and convincing evidence?

We believe that the present case falls in line closer to *Dillon* and *Repsel* than to *Willis, Jones,* or *Smith.* In both *Dillon* and *Repsel* no father's name appeared on the birth certificate, and the husbands actually testified that they had not had sex with their wives around the time of conception, yet the clear and convincing burden was not met. In the present case, the evidence similar to that of *Dillon* and *Repsel* regarding nonpaternity is weaker. Here, similarly, no father's name appears on the birth certificate, but an age does, and it fits Johnny Binion rather nicely. This is strong evidence rebutting the ALJ's view of the case. Here also, the 1975 applications suggest Sandra and Johnny had no sexual contact in the fall of 1975, but no evidence clearly indicates such a fact. As in *Dillon* and *Repsel,* nothing convincingly indicates Sandra and Johnny were inaccessible to each other during their separation. They lived in the same city, and nothing indicates Johnny stopped seeing his other four children (who lived with Sandra) or was unable to visit Sandra during the separation. No evidence indicates that by 1975 Johnny was impotent.

The remaining items weighing against Clifton's legitimacy—the omission on the divorce decree, Sandra's poor explanations for the omissions, and Rosa Lee's unsigned hearsay statement—just do not raise this case to a level similar to *Willis.* Although the omissions on the birth certificate and divorce decree are similar, *Willis* had far more compelling evidence to add to those documents: inaccessibility of the husband, testimony of nonparties that another man treated her as his daughter, life insurance policies referring to her as the other man's daughter. Rosa Lee's statement pales in comparison to this evidence. Likewise, *Jones* and *Smith* both involved more convincing evidence regarding nonpaternity than the present case, and, notably, all of these cases—and even *Dillon* and *Repsel*—included another man as a possible father. Here, nothing points to another

man being Clifton's father. The Commissioner cannot contend·that Clifton was immaculately conceived, and it is likely that if some other man was around, Clifton's siblings, Johnny's siblings, or Rosa Lee (with whom Johnny stayed when he was not with Sandra) would have had some inkling about it.

For every bit of evidence weighing against Johnny's paternity, an equal, if not stronger, piece of evidence points back to Clifton's legitimacy. For example, as in *Willis,* Sandra's divorce decree does not mention Clifton as a child of the marriage, and the ALJ found Sandra's testimony regarding the actual separation date to be suspect. Yet the divorce decree—which, like the 1975 benefits applications, was made at a time when Sandra had no incentive to skew the facts to support the present benefits application— states that Johnny left Sandra in February 1976. The Commissioner does not dispute that Clifton was conceived 3 months before that date, and the ALJ gave no justification for giving one part of the divorce decree greater weight than another and for ignoring the fact that the separation date in the divorce decree supported Clifton's legitimacy. The same is true for the birth certificate. As we have noted, although the father's name and place of birth are blank, the age matched Johnny's at the time, yet the ALJ failed to address this important fact.

■ Likewise, Rosa Lee's alleged statement that she did not believe Clifton was Johnny's son, that Johnny never bought Clifton clothes or other items, and that Johnny would say the same if he were alive, was contradicted by five sworn witnesses as well as Rosa Lee's other unsigned statement. Even if we discredit the testimony of Clifton and his sisters because of possible bias (although the ALJ did not indicate he was doing that, it is implied in his decision), the contradiction of this statement by Rosa Lee remains because Alberta and Sammy (Rosa Lee's own children) both indicated that Johnny recognized Clifton as his son,[4] and Rosa Lee's other statement indicates not only that Johnny told others that Clifton was his child, but that Sandra and Johnny lived together when Clifton was conceived. Although we do not believe the ALJ committed an error of law in considering the hearsay statements of Rosa·Lee,[5] the ALJ never reconciled these direct contradictions to the one statement of Rosa Lee that he deemed "significant." Because Rosa Lee did not testify at the hearing and because her two hearsay statements contradicted each other, the ALJ could not assess her credibility, let alone give one of her statements more weight than the other. At the very most, the one statement of Rosa Lee against legitimacy cancels out the other in favor of Clifton's legitimacy. And in cases where testimony cancels itself out and is thus inconclusive, the presumption of legitimacy wins. *See Dillon,* 195 Ill.App.3d at 602–09, 142 Ill.Dec. 341, 552 N.E.2d 1082 (testimony of Willie and Dorris's wife was inconclusive regarding with whom Dorris lived).

Finally, the ALJ thought that Sandra's explanations regarding the omissions on the certificate and decree were not believable, mainly because they were self-serving. Even disregarding such explanations by Sandra due to this credibility determination, the testimony of Alberta and Sammy, the statement by Rosa Lee that she believed Johnny and Sandra were living together, and the separation date in the divorce decree point right back to Clifton's legitimacy.

■ An ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The ALJ in this case, however, seemed to pick and choose among the

---

4. The ALJ never adequately explained how Alberta's and Sammy's testimony, which cannot be deemed "selfserving" like Sandra's or that of Clifton or his sisters, was discredited. The ALJ merely stated that he discounted the testimony of Johnny's siblings because of the overwhelming inference of the omissions on the birth certificate and divorce decree. Because he failed to address the actual credibility of Johnny's siblings at all, we do not give his rejection of their testimony the deference normally awarded to credibility determinations.

5. The rules of evidence do not apply in hearings before the ALJ. 42 U.S.C. § 405(b)(1); *Keller v. Sullivan,* 928 F.2d 227, 230 (7th Cir.1991) (hearsay statements admissible before ALJ if relevant and material).

pieces of evidence, giving one of Rosa Lee's statements more weight than the other, citing one part of the divorce decree but not another, disregarding Alberta's and Sammy's testimony not because of their own credibility but because of Sandra's actions.

At oral argument Sandra's counsel conceded—correctly we think—that if she had to *prove* paternity by clear and convincing evidence, she would lose. And we grant that the omissions on both the birth certificate and divorce decree raise suspicions that Johnny was not Clifton's biological father. We think it *possible* that Johnny was not Clifton's father; perhaps it is even *probable*. The presumption, though, is in Clifton's favor, and that's the law in Illinois. Looking at the evidence *as a whole*, which the ALJ did not do, we note that for every piece pointing away from Clifton's legitimacy, something else points back the other way. If evidence beyond a reasonable doubt is almost jet black on the black/white scale, clear and convincing evidence regarding the legitimacy presumption requires a dark charcoal shade. The record here shows evidence against legitimacy in the medium grey range at most, which means the presumption carries the day. In the face of inconclusive information, we believe that the ALJ could not reasonably find the presumption, which is a strong one, overcome. Thus, no substantial evidence supports the ALJ's conclusion that Clifton was not Johnny's "child."

The Commissioner has argued no other basis for denying Clifton child's insurance benefits. We therefore reverse the decision of the district court and remand with directions to grant summary judgment to Sandra and Clifton.

REVERSED.