In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2261

Sheryl Smith Schoenfeld, for herself and
on behalf of Charles Mandeville, Kathleen
Mandeville, and Jocelyn Mandeville,

Plaintiff-Appellant,

v.

Kenneth S. Apfel, Commissioner of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 C 368--Barbara B. Crabb, Judge.

Argued December 4, 2000--Decided January 11, 2001

Before Flaum, Chief Judge, and Diane P. Wood and
Williams, Circuit Judges.

Flaum, Chief Judge. After her husband passed
away, Sheryl Schoenfeld sought child's benefits
on behalf of her three children, in addition to
mother's benefits and a lump sum death benefit
for herself. After an administrative hearing
determined that the children were entitled to
child's benefits on the wage earner's record, and
that she was entitled to mother's benefits, the
Appeals Council reversed, holding that the
evidence did not support a finding that the wage
earner fathered the children. The Appeals Council
decision, which is considered the final decision
of the Commissioner of Social Security, was
appealed to the District Court for the Western
District of Wisconsin, which granted summary
judgment in favor of the Commissioner.
Thereafter, Schoenfeld appealed the district
court's decision to this Court, arguing that the
Appeals Council's findings are not supported by
substantial evidence, and that the Council made
errors of law. For the reasons stated herein, we
affirm the district court's grant of summary
judgment.

I. BACKGROUND

The wage earner, Clarence Schoenfeld ("Clay"),

born on December 12, 1918, was a college professor at the University of Wisconsin. In July of 1969, Clay wed Sheryl Smith ("Sheryl"), a graduate student at the University. Though Clay had three children from a previous marriage, at the time of their nuptials, Clay informed Sheryl that he did not wish to have any additional children; a request that Sheryl initially acquiesced to. At some point though, Sheryl began to waver. In 1978, Sheryl moved out of Clay's residence, and inquired into the possibilities of artificial insemination and adoption. However, she was rejected for both.

In 1979, while vacationing in Rome, Sheryl became acquainted with a self-declared CIA operative and native Australian, Michael Mandeville. During a dinner conversation, Mandeville conveyed to Sheryl that he was interested in having children, but believed that because he was a covert agent for the CIA operating in Rome, he was in no position to be a parent in a "traditional" way. Eventually, the two arrived at a symbiotic arrangement whereby Mandeville agreed to supply his sperm to Sheryl for insemination purposes, and Sheryl agreed to give any resulting offspring the Mandeville surname.

Shortly thereafter, Sheryl inseminated herself, using a syringe filled with Mandeville's sperm. According to Sheryl, Clay knew of and consented to this attempt at pregnancy. Sheryl became pregnant and on October 10, 1980, gave birth to Charles Mandeville. Though Michael Mandeville and Sheryl were never married, the birth certificate lists Mandeville as Sheryl's husband. During the time period in which Charles was conceived, Clay and Sheryl continued their conjugal relationship, relying on the birth control techniques of "rhythm" and "withdrawal."

On November 24, 1980, a little over a month after the birth of Charles, Sheryl and Clay entered into a legal separation. The Judgment of Legal Separation decreed that "the child, Charles Smith (sic), born August 10, 1980, to petitioner Sheryl Stateler Smith, is not the child of the marriage and the joint petitioner, Clarence A. Schoenfeld, is not the father." Subsequent to the separation decree, Sheryl and Clay continued to have sexual relations, as well as to hold themselves out publically as husband and wife. Furthermore, Clay continued to provide financial support to Sheryl, including, but not limited to, making mortgage payments for Sheryl.

In early 1982, Sheryl once more inseminated herself with Mandeville's sperm, and on December 16, 1982, Kathleen Mandeville was born. Again,

Michael Mandeville was listed as the husband, and Clay and Sheryl had relations during the conceptive period. In 1983, as a result of his age and poor health, Clay moved into and thereafter resided at a retirement community. Nonetheless, Clay continued to spend time with Sheryl at their residence, and the couple never filed for divorce. Also in 1983, Clay applied for retirement benefits, stating on his application that he had no natural children, adopted children or stepchildren who were at that time under the age of 18. On May 17, 1985, a third child named Jocelyn Mandeville was born after employment of the same purported "homemade artificial insemination technique." Once again, Michael Mandeville was listed as Sheryl's husband on the birth certificate, and Clay had sexual relations with Sheryl during the conceptive period. Testing (DNA or blood) to determine the paternity of the children has never been conducted.

To this date, it does not appear that Mandeville ever provided financial or emotional support to Charles, Kathleen or Jocelyn. However, the record indicates that all three children were covered under Clay's insurance policy, and were supported emotionally by Clay. In October 1990, though he still resided at a retirement community, Sheryl and Clay renewed their wedding vows in the presence of family and friends. Five years later, on February 24, 1996, Clay passed away.

In April of 1996, Sheryl filed applications for child's benefits on behalf of Charles, Kathleen, and Jocelyn Mandeville based on Clay's earning record. Additionally, Sheryl filed for mother's benefits and lump sum death benefits for herself. Her applications were denied initially and again upon reconsideration. At Sheryl's request, an administrative hearing was held on May 21, 1998. The Administrative Law Judge's ("ALJ") decision, dated September 23, 1998, found (1) the three children to be entitled to child's benefits; (2) Sheryl to be entitled to mother's benefits; and (3) Sheryl not to be entitled to the lump sum death benefits, as she was not living with the wage earner at the time of his death. The ALJ's decision was based on his finding that there was no clear and convincing evidence to rebut the presumption under Wisconsin law that a child born to a married mother is presumed to be a marital child.

On April 6, 1999, the Appeals Council reopened the matter, and proposed to revise the ALJ decision. Though Sheryl objected, on April 28, 1999, the Appeals Council issued a decision reversing the ALJ: finding that Sheryl was not entitled to the lump sum death benefits, and that

the children and Sheryl were not entitled to child's and mother's benefits on the wage earner's record. Specifically, the Appeals Council found that a clear and satisfactory preponderance of the evidence upset the presumption that Clay was the natural father of Charles Mandeville, and that because of Clay and Sheryl's separation, no presumption applied to Kathleen and Jocelyn. The Council further noted that Clay referred to himself and was considered by the children to be their stepfather instead of their natural father. In addition to finding that Charles, Kathleen, and Jocelyn were not the natural children of the wage earner, the Appeals Council expressly found the children not to be Clay's stepchildren either. That finding was based on the Council's interpretation of 20 C.F.R. sec. 404.357 to mean that a child is a wage earner's stepchild only if the wage earner married the child's mother at a time when the relationship of parent and child already existed between the mother and child.

On June 3, 1999, Sheryl appealed the Appeals Council decision to the United States District Court for the Western District of Wisconsin./1 On February 9, 2000, the district court entered summary judgment affirming the final decision of the Commissioner. Sheryl now appeals to this Court, arguing, in large part, that the Commissioner's evidentiary findings are not supported by substantial evidence, and that the Commissioner's decision incorrectly applied Wisconsin law.

II. DISCUSSION
A. Standard of Review

We review a district court's grant of summary judgment de novo. Green v. Shalala, 51 F.3d 96, 99 (7th Cir. 1995). With regard to final decisions of the Commissioner of Social Security,/2 our de novo review dictates that we apply the district court's standard of review, and uphold the Commissioner's decision if the findings of fact are supported by substantial evidence and no error of law occurred. See Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000); see also 42 U.S.C. sec. 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). In determining whether substantial evidence exists, we review the record as a whole. However, we do not substitute our judgment for that of the Commissioner "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." Williams v. Apfel, 179 F.3d 1066, 1071-72 (7th Cir. 1999); see Richardson v. Perales, 402 U.S. 389, 399-401 (1971). In order for this Court to

uphold a decision of the Commissioner, the standard requires that there be more than a scintilla of proof in support of that decision. Cannon, 213 F.3d at 974. But, "substantial evidence requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Diaz v. Chater, 55 F.3d 300, 305 (7th Cir. 1995) (internal quotation omitted).

Pursuant to the Social Security Act, every child of a worker who dies fully (or currently) insured is entitled to child's insurance benefits, assuming all other prerequisites are met. 42 U.S.C. sec. 402(d)(1). The definition of a child, according to the Act, includes not only a worker's natural child, but also any legally adopted child, and in certain circumstances a stepchild, grandchild, stepgrandchild, and equitably-adopted child. Id. at sec. 416(e). In determining whether an applicant for benefits should be considered the child of an insured individual, the Commissioner of Social Security applies the law governing intestate transfers in the state where the decedent was domiciled at the time of his or her death. Id. at sec. 416(h)(2)(A). Therefore, we direct our inquiry to an examination of Wisconsin intestacy law, and whether according to those laws the Mandeville children would be able to inherit the property of the decedent.

According to the basic rules for intestate succession in Wisconsin, the decedent's estate may pass to the decedent's issue. Wis. Stat sec. 852.01. In keeping with the definition contained in sec. 990.01(17), an "issue" includes all the lawful descendants of the ancestor. Within the penumbra of lawful descendants lies the category of marital child, which Wisconsin law defines to include any "child who is conceived or born while his or her parents are lawfully intermarried," as well as any "nonmarital child who is adopted or whose parents subsequently intermarry under sec. 767.60." Wis. Stat. sec. 990.01(19m). For completion purposes, the law defines a nonmarital child as "a child who is neither conceived nor born while his or her parents are lawfully intermarried, who is not adopted and whose parents do not subsequently intermarry under sec. 767.60." Id. at sec. 990.01(23m).

While the law allows for the decedent's estate to pass to marital children, in certain circumstances, it also provides that a nonmarital child is entitled to take in the same manner as a marital child by intestate succession. Wis. Stat. sec. 852.05. Specifically, if a nonmarital child's father has (1) been adjudicated to be the father in a paternity proceeding under sec. 767

or by final judgment of a court of competent jurisdiction in another state; or (2) admitted in open court that he is the father; or (3) acknowledged himself to be the father in a writing signed by him, the child takes as a marital child. Id. Therefore, in order to obtain child's benefits in Wisconsin, the child must be shown to be either a marital child or fall within one of the above categories of nonmarital children. With this background, we now proceed to analyze the merits of this appeal.

B.  Constitutional Claims

As a preliminary matter, we note that much of appellant's/3 brief is devoted to raising equal protection and due process arguments under the Fifth Amendment of the Constitution of the United States. In appellant's reply brief, as well as during oral argument, appellant conceded that these arguments were not raised below. We have long held that "[i]ssues that a claimant fails to raise before the district court are waived on appeal." Ehrhart v. Secretary of Health and Human Serv., 969 F.2d 534, 537 n.4 (7th Cir. 1992); see also United States v. Andreas, 150 F.3d 766, 769 (7th Cir. 1998) ("We have held time and again that perfunctory and undeveloped arguments (even constitutional ones) are waived."). Furthermore, the fact that appellant obtained different counsel for the purposes of filing her appeal does not allow her to raise these arguments before this Court. See Ehrhart, 969 F.2d at 537 n.6. At oral argument, appellant all but abandoned her constitutional challenges and requested that we examine the claims only as they relate to the proper application of Wisconsin law by the Appeals Council. Because we view appellant's constitutional challenges as having been waived, we proceed to analyze the factual findings and legal underpinnings behind those claims, and examine whether the district court was correct in granting the Commissioner summary judgment.

C.  Commissioner's Evidentiary Findings

The district court granted the Commissioner summary judgment, after accepting the magistrate judge's recommendations that there was substantial evidence to support the Commissioner's factual findings (and that no error of law was made). Once again, substantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion, such that where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner. See Binion ex rel. Binion v.

Chater, 108 F.3d 780, 782 (7th Cir. 1997). Appellant's specific contention before this Court is that there was not substantial evidence to support the Commissioner's findings that the Mandeville children were not the natural children of the wage earner./4

Once more, we must return to Wisconsin law to determine whether the Mandeville children should be considered the natural children of Clay. Wisconsin statutes provide that "[w]henever it is established in an action or proceeding that a child was born to a woman while she was the lawful wife of a specified man, any party asserting in such an action or proceeding that the husband was not the father of the child shall have the burden of proving that assertion by a clear and satisfactory preponderance of the evidence." Wis. Stat. sec. 891.39(1)(a). A clear and satisfactory preponderance of the evidence is a higher degree of proof than is required in most civil actions but not as great as the burden of proof reserved for criminal actions. See Wis. Stat. sec. 891.39 legislative council notes. Yet, as we shall discuss, the presumption of paternity contained in sec. 891.39(1)(a) is inapplicable if the parents are legally separated; as happened in this instance in between the births of Charles and Kathleen. Thus, in examining the Mandeville children's status vis e vis Clay, we sunder our examination, first addressing Charles' status and then that of Kathleen and Jocelyn.

1.  Charles Mandeville

Because Charles was conceived and born while Clay and Sheryl were married, the presumption contained in sec. 891.39(1)(a) is applicable. Here, appellant argues that there was insufficient evidence to overcome the presumption that Charles is the natural child of Clay. In concluding that the record contained sufficient evidence to rebut the presumption, the Appeals Council cited the following: (1) Sheryl's acknowledgment that Charles was conceived by artificial insemination using Mandeville's sperm; (2) the statement in the Judgment of Legal Separation that Charles was not Clay's child; (3) Clay's statement under penalty of perjury at the time he applied for benefits that he had no minor children; (4) the fact that Clay referred to himself and was considered by the children to be a stepfather rather than a natural father; and (5) that Sheryl and Clay actively attempted to avoid impregnation during intercourse.

In arguing that there was insufficient evidence to rebut the paternity presumption, appellant states that "it is unclear what weight should be given to the evidence cited by the Appeals

Council and affirmed by the District Court because it was assumed that Sheryl acted on behalf of Charles Mandeville in the proceedings below." It is incontrovertible that Sheryl's testimony is admissible for purposes of determining paternity. As the statute plainly states, "In all such actions or proceedings the husband and the wife are competent to testify as witnesses to the facts." Wis. Stat. sec. 891.39(1)(a). Thus, we must question to what end appellant is challenging the statements made by Sheryl. To the extent that appellant claims the Appeals Council erred in not appointing a guardian ad litem to represent Charles' interests, we address that contention below, along with appellant's other legal challenges. However, inasmuch as appellant questions how much weight should have been granted to the testimony of Sheryl by the Appeals Council, that inquiry is out of bounds. As we stated above, when it comes to reviewing the final decision of the Commissioner, we do not reconsider facts, reweigh evidence, resolve conflicts in evidence, or decide questions of credibility. See Williams, 179 F.3d 1071-72. Thus, whether or not Sheryl had motivations to fabricate the circumstances surrounding her pregnancy does not factor into our analysis here. Similarly, appellant attacks reliance on the statement contained in the Judgment of Legal Separation, in that Charles was not represented in the proceedings. In support of that attack, appellant points out that "[i]t is well established that an infant is not bound by a judgment unless he is represented by a guardian ad litem at the time of its entry." In re Will of Brandstedter, 224 N.W. 735, 736 (1929). Once again, appellant attempts to invoke this legal argument as a justification for us to cross over into the reweighing of evidence relied on by the Appeals Council; an endeavor we will not undertake.

In suggesting that there was insufficient evidence to overcome the presumption that Charles is the marital child of Clay, appellant presents "medical evidence" in order to question the veracity of Sheryl's version of the insemination. Additionally, appellant argues that the presumption of Clay as the natural father cannot be overcome in this instance, given that no DNA or blood tests have been administered on the children to resolve the matter./5 While Wis. Stat. sec. 891.39 does recognize that a genetic test constitutes clear and satisfactory preponderance of the evidence, capable of rebutting the paternity presumption of the statute, there is no suggestion that lack of a DNA test precludes rebuttal of the presumption. A clear and satisfactory preponderance of the evidence can be found with less than the

certitude that genetic testing brings. For example, in Schmidt v. Schmidt, the Supreme Court of Wisconsin reversed a lower court decision that found insufficient evidence to rebut the presumption that Mr. Schmidt was the biological father of the child in question. 124 N.W.2d 569 (1963). In that case, the presumption was created (as here) by the fact that the couple was married at the time the child was conceived and born. Additionally, both the birth certificate and baptismal certificate listed Mr. Schmidt as the child's father, Mr. Schmidt supported the child, and never disavowed paternity prior to his divorce proceedings. Id. at 571. Yet, the court found that the testimony of the couple that their last date of intercourse precluded Mr. Schmidt from being the natural father of the child at issue, in conjunction with Mrs. Schmidt's admission of extramarital relations during the conceptive period constituted a clear and sufficient preponderance of the evidence and was thus sufficient to overcome the presumption that Mr. Schmidt was the father. See id. at 571-74. Here, the argument in favor of rebutting the presumption is stronger, as not only do we have both parents testifying that Clay is not the father, but we have the additional fact that Clay was never held out to be, or documented as the natural father of Charles. Yet, we need not rely on Sheryl's and Clay's assertions regarding the success of the artificial insemination procedure. The fact is that in 25 years of active sexual relations with Clay the only times that Sheryl became pregnant were following artificial insemination attempts. This evidence, which the Commissioner was entitled to consider, in conjunction with Sheryl's statements establishing the possibility that Mandeville's sperm impregnated Sheryl, is sufficient to rebut the presumption that Clay is Charles' natural father.

Ultimately though, our task is not as difficult as it may seem. While appellant continuously argues the absence of a clear and satisfactory preponderance of the evidence to rebut the presumption that Clay is Charles' natural father, our review is much more limited. As stated numerous times throughout this opinion, we sit, with regard to factual determinations of the Appeals Council, only to insure that those determinations are supported by substantial evidence. See Binion, 108 F.3d at 782. Here, given the statements (made under penalty of perjury) of both Sheryl and Clay, the birth certificate, the articulation contained in the decree of separation, and the day-to-day manner in which the children regarded Clay, we find that substantial evidence supports the Appeals Council's decision that Charles was not the

marital child of Clay.

2.  Kathleen and Jocelyn Mandeville

        Whether there was substantial evidence to
support the decision of the Appeals Council that
Kathleen and Jocelyn are not the marital children
of Clay is a more straightforward question, given
the analysis above and the legal separation that
occurred prior to their births. According to Wis.
Stat. sec. 891.41, "a man is presumed to be the
natural father of a child if . . . (a) He and the
child's natural mother are or have been married
to each other and the child is conceived or born
after marriage and before the granting of a
decree of legal separation, annulment or divorce
between the parties." Thus, if the child was
conceived subsequent to a decree of legal
separation, as was the case here, there is no
presumption as to paternity. Aside from the
decree of legal separation, and the statement
contained therein, the factual circumstances
surrounding Kathleen and Jocelyn's births are
indistinguishable from those regarding Charles.
The appellant does not present any additional
arguments in support of reversal of the Appeals
Council's determination, besides those previously
discussed in relation to Charles' paternity.
Despite the presumption that Charles is Clay's
marital child, we determined that there was
substantial evidence to support the Appeals
Council's decision to the contrary. A fortiori,
in the cases of Kathleen and Jocelyn, where there
is no presumption that Clay is the father, we
find that there was substantial evidence to
support the Appeals Council's decision.

D. Commissioner's Application of Appropriate Legal
Standards

        In addition to challenging the Commissioner's
factual findings, appellant also argues that the
Commissioner erred in applying Wisconsin law. As
we alluded to above, the Commissioner's
conclusions of state law are not entitled to
deference. Therefore, "if the Commissioner
commits an error of law, reversal is required
without regard to the volume of evidence in
support of the factual findings." Binion, 108
F.3d at 782.

        Appellant's primary contention regarding legal
error by the Appeals Council is that by not
appointing a guardian ad litem to represent the
interests of the children, the Commissioner
incorrectly applied Wisconsin law. In support of
this argument, appellant cites Wis. Stat. sec.
891.39 which states that in all actions in which
the presumption that the husband is not the
father is being challenged, "[t]he court or judge

in such cases shall appoint a guardian ad litem to appear for and represent the child whose paternity is questioned."

Appellant's argument is unconvincing for numerous reasons. First, we note that this argument was not raised at the district court level and as such we believe that it has been waived. See Andreas, 150 F.3d at 769. Appellant recognizes that the guardian ad litem issue was not directly presented below, but urges this Court to consider the claim as being encapsulated within the general challenge to the appropriate application of Wisconsin law. However, the legal challenges presented below did not center around the appointment of a guardian ad litem, but rather around whether it was proper for the Appeals Council to reopen, reexamine, and reverse the decision of the ALJ. Nonetheless, giving the appellant a degree of latitude and assuming arguendo that the claim has not been waived, we still fail to see error in this instance.

The Social Security Act does not mandate that a guardian ad litem be appointed to protect a minor's interest, and appellant has not provided any case law to suggest otherwise. Rather, the appellant claims that determining whether an applicant for benefits should be considered the child of an insured individual demands that the Commissioner here apply Wisconsin law governing intestate transfers. 42 U.S.C. sec. 416(h)(2)(A). Since Wisconsin law requires such an appointment, the fact that one did not occur in this instance requires reversal of the Commissioner's decision./6

We disagree that Wisconsin law requires such an appointment. As the appellant notes, the requirement of appointing a guardian ad litem applies in limited circumstances, such as when custody is at issue--as is contemplated under Wis. Stat. sec. 891.39. See e.g., Bahr v. Bahr, 240 N.W.2d 162, 164 (1976) (holding that it is reversible error for the trial court to fail sua sponte to appoint a guardian ad litem before deciding contested custody issues, even if neither party has requested the appointment of a guardian ad litem). Appellant recognizes that the Commissioner's adjudication here does not fall within that limited category, and therefore points out that "beyond custody cases, courts have discretion to determine whether concern is 'special' so as to require appointment of a guardian ad litem." See deMontigny v. deMontigny, 233 N.W.2d 463 (1975)./7 Thus, the appellant attempts to pigeonhole this case within the limited categories of Wis. Stat. sec. 767.045(1)(a)(1) (where the court has reason for special concern for the welfare of the child),

and Wis. Stat. sec. 803.01(3) (where the interests of the minor are adverse to that of the general guardian).

In support of the notion that Sheryl's interests conflicted with that of the children, appellant suggests that Sheryl had motivation to maintain that the children were the product of artificial insemination, in order to keep Clay from divorcing her./8 Taken at face value, this assertion would only be relevant to the statement contained within the separation decree that Charles was not the son of Clay. Since a guardian was not appointed for those separation proceedings, it is clear that the statement contained in the decree is not a binding declaration of Charles' paternity. "It is well established that an infant is not bound by a judgment unless he is represented by a guardian ad litem at the time of its entry." In re Will of Brandstedter, 224 N.W. at 736. Thus, Charles would be free to litigate the issue of paternity, as provided by Wisconsin law. However, that failure to appoint a guardian, in an unrelated procedure over 20 years ago, does not require reversal of the Commissioner's decision in this matter. That Sheryl may have had a motivation to prevaricate in 1980 goes to the credibility of the statement in the separation decree, and does not show that Sheryl's interests conflicted with that of her children during the proceedings before the ALJ. The statement contained in the separation agreement is not being employed as a conclusively binding declaration of paternity, but rather as one of a number of reasons for rebutting the presumption that Clay is Charles' natural father. While there was a possible conflict of interest during the separation proceedings, that conflict (and the failure to appoint a guardian ad litem) in that instance works only to cast doubt on the credibility of the statement contained in the agreement. But, as we have stated numerous times in this opinion, we will not review the Commissioner's credibility determinations. Williams, 179 F.3d 1071-72.

In the proceedings before the ALJ, Sheryl had no motivation--other than to tell the truth--to suggest that Mandeville was the children's biological father. At that point, Clay was deceased and the stability of their marriage moot. As the Commissioner correctly points out, at that time, Sheryl's interests were squarely in line with those of her children. The only way by which Sheryl could obtain mother's benefits would be if the children were determined to be entitled to child's benefits. In fact, since it was uncontested that Sheryl would be entitled to her mother's benefits if the children were entitled to their benefits, in reality, the only interest

Sheryl was representing at the hearing was that of the children. Therefore, even assuming that appellant's guardian ad litem argument was raised below, we find no conflict that would have necessitated the appointment of a guardian ad litem./9

Finally we note that throughout appellant's brief, there is also a suggestion of legal error in that the Commissioner did not create a complete factual record. To the extent that appellant articulates this argument fully, it appears to be based on the failure of the Commissioner to conduct paternity tests. As we have noted above, while we believe that DNA or blood tests could resolve the paternity issue conclusively, it has been and continues to be within Sheryl Schoenfeld's power, as guardian of those children, to have those tests carried out. While tests were not requested by the Commissioner, even appellant notes that it is questionable whether such requests would have to be honored. Appellant has failed to point to any specific evidence that the Commissioner excluded, or explain how appellant was prejudiced by the record that was created. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." Binion v. Shalala, 13 F.3d 243, 246 (7th Cir. 1994). Thus, we hold that the Commissioner developed a fair and complete record.

III.  CONCLUSION

We agree with the district court that the Commissioner's findings are supported by substantial evidence and that the Commissioner correctly applied Wisconsin law.

For the foregoing reasons, we Affirm the decision of the district court.

/1 The decision of Appeals Council is considered the final decision by the Commissioner of Social Security and subject to judicial review pursuant to 42 U.S.C. sec. 405(g).

/2 Because the Commissioner has delegated the authority to make final decision to the Appeals Council, reviewing courts must defer to the Appeals Council's decision. White v. Sullivan, 965 F.2d 133, 136 (7th Cir. 1992). Hence, when the ALJ's decision is reversed by the Appeals Council, it is the Appeal's Council decision which constitutes the Commissioner's final decision for purposes of judicial review under 42 U.S.C. sec. 405(g). See also 20 C.F.R. sec.sec.

404.979, 404.981.

/3 Throughout the course of this opinion, we use "Sheryl" and "appellant" when referring to Ms. Schoenfeld. These terms are not used interchangeably. The use of the term "appellant" is confined to referencing Sheryl Schoenfeld, as she appears in this suit, for herself and on behalf of her children. All uses of "Sheryl" denote Ms. Schoenfeld as the individual actor.

/4 Before the Appeals Council and the district court, appellant alternatively argued that even if the Mandeville children were not considered Clay's natural children, they should be considered his stepchildren. This argument was founded in the assumption that the renewal of wedding vows in 1990 between Sheryl and Clay Schoenfeld acted as a marriage (or would have been a marriage but for legal impediment), thereby making the children eligible for benefits under the law. See 42 U.S.C. sec. 416(h)(2)(B) ("You may be eligible for benefits as the insured's stepchild if, after your birth, your natural or adopting parent married the insured."). This argument was rejected by the Appeals Council as well as the district court, and is not before us on appeal. Therefore, our inquiry is confined to examining whether the children should be considered the natural children of the wage earner.

/5 We are troubled by the fact that appellant's arguments as to why the Appeals Council decision should be overturned rest largely on the innuendo, contained in appellant's brief, that appellant Sheryl Schoenfeld concocted the entire Mandeville saga. Additionally, we find it disingenuous for Sheryl to suggest that the lack of DNA tests to establish paternity somehow precludes rebuttal of the presumption that Clay is Charles' natural father (as well as the natural father of Kathleen and Jocelyn). Given that as their guardian, it has always been and continues to be within Sheryl's power to have those tests conducted, and to enlist the aid of the Wisconsin courts in determining the children's paternity, we do not believe it is appropriate for Sheryl to benefit from the shadow of doubt that she has created. Were this a situation where Sheryl had not passively waited for the ALJ to gather the evidence and make her case for her, but instead had attempted, and been unsuccessful at having paternity tests conducted, perhaps the Commissioner would have viewed this case differently. However, we fail to understand how the appellant can claim that the "critical determination" of paternity, under Wisconsin law "must be made," while at the same time (1) never attempt to have that determination made; and (2)

state "that whether ordering DNA or blood tests would have been allowable in the instant case is not at issue."

/6 It is unclear whether the requirement of applying state intestacy law directs that we follow state rules regarding the appointment of a guardian ad litem, or are limited to more substantive aspects of the determination under state intestacy laws. In Bennemon ex rel. Williams v. Sullivan, we noted that the determination of intestate succession as applied in benefits cases requires the "following [of] a specific state-law procedure, as opposed to merely satisfying a substantive criterion of law." 914 F.2d 987, 992 (7th Cir. 1990). For purposes of this appeal, we assume arguendo that guardian ad litem appointments in Social Security benefits cases are governed by state law.

/7 While on the one hand appellant recognizes that outside of limited circumstances, appointment of a guardian ad litem is discretionary, appellant also broadly suggests that a guardian ad litem must be appointed on all issues even tangentially related to paternity.

/8 This unsupported allegation appears for the first time in appellant's reply brief.

/9 We note in passing that appellant's complaint regarding the failure to appoint a guardian ad litem is directed to the ALJ hearing. It was at that hearing, when the children were, according to the appellant, not adequately represented, that they received a favorable determination.